**STATE of Missouri, Respondent,**

v.

**Kenneth H. THOMPSON, Appellant.**

**No. SC 83661.**

Supreme Court of Missouri,
En Banc.

Aug. 27, 2002.

Rehearing Denied Oct. 22, 2002.

Rosemary E. Percival, Officer of the Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Assistant Attorney General, Jefferson City, for Respondent.

RICHARD B. TEITELMAN, Judge.

This is an appeal from two sentences of death obtained in the Circuit Court of Dallas County. Appellant, Kenneth H. Thompson, had been tried and convicted of two counts of first degree murder and sentenced to death on both counts. On appeal, this Court affirmed the findings of guilt as to both counts, but reversed the sentences of death and remanded for a new penalty phase trial. At the new penalty phase trial, the jury originally returned verdicts of life imprisonment, but upon being polled the jury appeared to lack unanimity and the trial judge ordered them to return for further deliberations. Shortly thereafter, the jury announced that it was deadlocked. The judge sentenced Appellant to death on both counts. This Court has exclusive jurisdiction over the appeal pursuant to Mo. Const., art. V, section 3. The judgment is reversed, and the cause is remanded for a new sentencing trial.

## I. BACKGROUND

In the early morning hours of August 5, 1996, Appellant entered the trailer home where his estranged wife, Tracie, was living with her mother, Arlene Menning, and her stepfather, Clarence Menning. After checking on his wife and children and find-ing them asleep, Appellant went into the bedroom where the Mennings were sleeping. He repeatedly struck Mr. Menning and then Mrs. Menning in the head with a maul handle. They died as a result of severe brain and skull injuries from the blows to their heads.

Appellant then raped Tracie, forced her and the children out of the trailer and into his van, and drove around for several hours. After she promised not to call the police, Appellant dropped her and the children off at a friend's home. Appellant was arrested and taken into custody later that day, and subsequently charged with two counts of first degree murder. Following a trial in December 1997, Appellant was convicted and sentenced to death on both counts. There is no question as to the sufficiency of evidence supporting the findings of guilt. *State v. Thompson*, 985 S.W.2d 779, 783–784 (Mo. banc 1999). On appeal, this Court affirmed the verdicts of guilt but reversed the sentences of death and remanded for a new penalty phase trial. *Id.* at 792.

At the new penalty phase trial, both the State and the defense presented evidence. The court instructed the jury to consider three aggravating circumstances as to each murder: (1) whether each murder was committed during another unlawful homicide; (2) whether each murder involved depravity of mind by Appellant's repeated and excessive acts of physical abuse upon the victims; and (3) whether each murder was committed while Appellant engaged in the perpetration of rape. At the close of evidence, instructions and arguments of counsel, the jury deliberated. The jury was given three verdict forms for each count, one for a verdict of life imprisonment without possibility of probation or parole (hereinafter, "life imprisonment"), one for a verdict of death, and one for a verdict of inability to agree upon the pun-

ishment (commonly known as the "dead-locked" verdict).

An hour and a half into deliberations, the jury sent a note to the judge stating, "We just found out that one of our jurors does not believe in imposing the death penalty." About forty minutes later, and while parties' counsel were still discussing what to do about the note[1], the jury sent a message that it had reached a verdict, then another message that it needed a few minutes longer.

Five minutes later, the jury returned to the courtroom. The court clerk read the verdicts, which were life imprisonment on each count. The court then polled the jury, asking each individual juror, "Is that your verdict?" Although one of the jurors, George Meyer, stated that it was his verdict, each of the other eleven jurors stated that it was not his or her verdict, answering "no."

After the jury was polled, the prosecutor asserted that there was no verdict in the case and asked that the jury be told to continue to deliberate. Defense counsel contended that the life sentences reflected the jury's actual verdict, and began to argue that the jurors' answer to the polling question could merely indicate that the jury was not unanimous as to one of the necessary four steps in the jury instruction. The court interrupted counsel mid-sentence, and stated: "No, it either is or is not their verdict." The court then refused to accept the original verdict and, without questioning the jurors any further or offering clarifying instructions, sent them back with a clean set of verdict forms to deliberate further.

About fifteen minutes after receiving the new verdict forms, the jury returned to the courtroom. On both counts, the jury gave verdicts indicating they were unable to decide upon punishment. The court polled the jury once again, and this time each juror stated that it was his or her verdict. *Sua sponte*, the court then asked the foreperson about the reason for the change in verdicts, and the following exchange took place:

THE COURT: Thank you. Madam foreperson, can you tell me as to why the disparity, the difference? The last one was——I don't want to put words in your mouth, but I have now a second one that you all have acknowledged as your decision. For the record can you tell us——

FOREPERSON COPELAND: Yes, Your honor. We misunderstood as far as unanimously agreeing upon a verdict. What we understood was that if we did not agree on one then we would have to vote the other way. But we were not all in agreement of the other verdict so we misunderstood. And we decided with that misunderstanding that we would, because we could not agree on a decision unanimously, that we would give it to the Court.

Defense counsel then asked that the jurors be polled as to their vote during deliberations, including: (1) Did they unanimously find at least one statutory aggravator for each count? (2) If so, then did they unanimously agree that the ag-

**1.** The prosecutor thought the note was evidence of possible juror misconduct on the part of the juror to whom the note referred and wanted to ask the jury about it, but also stated that if there was a verdict, "obviously we have to take it and I will be requesting the jury be polled." Appellant's counsel said that the note was ambiguous, and did not want any inquiry to clarify the meaning of the note, even if the jury had reached a verdict and even if that verdict was that the jury could not decide on punishment. The situation was explained to Appellant by the trial court and counsel, and Appellant waived any inquiry of the jurors regarding the meaning of the note.

gravating circumstances warranted imposition of the death penalty? The prosecutor objected to such an inquiry, arguing that the foreperson had already explained that the jurors had originally "misunderstood" the process, and to inquire further into the jury's deliberations would be improper. The court agreed, refused to make further inquiry, and accepted the "deadlocked" verdicts.

At the final sentencing hearing, the trial court sentenced Appellant to death. The court found two aggravating circumstances for each count: the murder was committed while Appellant was engaged in another unlawful homicide, and the murder was committed while Appellant was engaged in the perpetration of rape.

The defense at sentencing presented the affidavit of juror Meyer. In the affidavit, Meyer stated that he believed the death penalty is appropriate in some situations, and in such cases, he could vote for and sign the verdict form. He further asserted the jury had unanimously agreed that the State had proven the existence of at least one aggravating circumstance beyond a reasonable doubt, but that he was unable to conclude the aggravating circumstances in Appellant's case warranted the death penalty. He stated the jury was therefore not unanimous as to this "step" in the process, and that because the jury lacked unanimity as to this step, the jury believed that under the court's instructions it was required to return a verdict of life imprisonment. He explained that when the court sent the jurors back to deliberate after their initial life imprisonment verdicts, they were confused as to the reason their verdicts had not been accepted. He stated the jurors then concluded that because they appeared to lack unanimity in answering the polling question, their original understanding must have been incorrect and that the verdict form indicating the jury could not agree upon punishment must be the appropriate form. He indicated he had never altered his belief that the aggravating circumstances, taken as a whole, did not warrant the death penalty in Appellant's case.

The court refused to consider Meyer's affidavit, on the ground that it improperly impeached the verdict. The court overruled Appellant's motion for new sentencing trial and sentenced Appellant to death on both counts. This appeal followed.

## II. DISCUSSION

Appellant raises twelve points on appeal. We find the first to be dispositive.

Appellant contends the trial court erred and abused its discretion in rejecting the jury's initial verdict of life imprisonment, *or in the alternative* in failing to conduct a more detailed polling inquiry to determine the reason that the jury returned its verdict and "the point at which the jurors lacked unanimity." Appellant contends that these actions deprived him of his constitutional rights to a fair trial, due process, and freedom from cruel and unusual punishment, as well as his statutory right to jury sentencing, in that: (1) the jurors properly returned a verdict of life imprisonment, because they correctly understood and followed the court's instructions requiring them to return such a verdict if they did not unanimously agree as to the second step in the statutory four-step decision-making process; (2) due to its own misunderstanding of the jurors' response to an ambiguous polling question, the court rejected the verdict and sent the jurors back to deliberate further without asking them necessary clarifying questions or providing any further instruction; and (3) the court's actions led the jurors to mistakenly believe that their first verdict must be improper, thereby effectively coercing them to return a deadlocked verdict be-

cause that seemed the only possible verdict in light of the court's actions.

■■■ A trial court's failure to properly examine the verdict for defects, inconsistencies and ambiguities may result in reversible error. *State v. Dorsey,* 706 S.W.2d 478, 480 (Mo.App.1986). The trial court can resolve inconsistencies or ambiguities by returning the jury to further deliberations or by polling the jury. *Id.* In any case upon the appearance of any uncertainty or contingency in a jury's verdict, it is the duty of the trial judge to resolve that doubt, for "[t]here is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination." *See United States v. Morris,* 612 F.2d 483, 489 (10th Cir.1979). Likewise, a trial judge is not empowered to refuse arbitrarily to accept a jury verdict, or coerce a jury to reach a verdict. *See State v. Apodaca,* 123 N.M. 372, 940 P.2d 478, 484 (App.1997) *(collecting authorities).*

Section 565.030.4 RSMo 2000[2] provides a four-step process for a jury determination of whether to sentence a defendant to death. First, the jury must unanimously find at least one statutory aggravating circumstance beyond a reasonable doubt. Second, the jury must unanimously find that the evidence in aggravation of punishment warrants imposing a death sentence. Third, the jury must decide whether there is evidence in mitigation of punishment which outweighs the evidence in aggravation of punishment. Fourth, the jury must decide, under all the circumstances, whether to impose a death sentence. *Section 565.030.4.* Any lack of unanimity regarding steps 1 or 2 mandates a verdict of life imprison-

ment without possibility of probation or parole. *Id. See also* MAI–CR3d 313.40; MAI–CR3d 313.41A; *State v. Ramsey,* 864 S.W.2d 320, 337 (Mo. banc 1993); *State v. Whitfield,* 837 S.W.2d 503, 515 (Mo. banc 1992). If the jury gets beyond the first two steps but is not unanimous as to either of the last two steps, however, then the jury must return a verdict stating the jurors cannot decide upon punishment. *Section 565.030.4;*[3] *see also* MAI–CR3d 313.48A.

■■ In the case at bar, the jury was clearly and properly instructed as to these requirements in the submitted written verdict director instructions and verdict mechanics instructions. As noted earlier, when the jury initially returned to the courtroom and the clerk announced their verdicts of life imprisonment, the prosecutor requested that the jury be polled. Each juror was asked, in turn, whether this was "your verdict." After one of the jurors answered that it was his verdict and the other eleven jurors each answered that it was not his or her verdict, the court refused to accept the life verdicts and ordered the jury to return for further deliberations, without first asking the jurors any further questions in an attempt to clarify their intent or ascertain at what point the jurors may have lacked unanimity.

Given the unique context of a capital sentencing trial where a jury has returned a verdict of life imprisonment but upon being polled the jury initially appears to indicate a lack of unanimity, two problems arise. First, the polling questions needed to reach the heart of the matter in a

2. All further statutory references are to RSMo 2000 unless otherwise noted.

3. In 2001, the Missouri Legislature amended section 565.030.4, as it applies to offenses committed after August 28, 2001. *See Sec-*

*tions 565.030.4 and .7, RSMo Supp.2001.* We express no opinion herein interpreting any of the changes reflected in the 2001 amended version of section 565.030.4.

capital sentencing proceeding are different from the sole question asked in a guilt phase proceeding. In any other criminal trial, unanimity is required before the jury may return a verdict. In a capital sentencing proceeding, however, a proper verdict of life imprisonment can be reached *despite* the *lack* of unanimous agreement among the jurors as to either Step 1 or Step 2 of the required four-step process. As a result, an ambiguous polling question—one that fails to adequately take this aspect of the process into consideration—may fail to account for the fact that an apparent lack of unanimity among the jury can still reflect a proper life verdict. Second, in this unique context, the lone question "is this your verdict?" is inherently ambiguous.

In his concurring opinion in *Price v. North Carolina*, 512 U.S. 1249, 114 S.Ct. 2777, 129 L.Ed.2d 888 (1994), Justice Blackmun recognized the confusion that can result from imprecise polling questions in capital sentencing trials. The jury was individually polled, "Is this your answer?" *Id.* at 1250, 114 S.Ct. 2777. The North Carolina Supreme Court interpreted the question as "Is this your own individual answer?" *Id.* Justice Blackmun, however, recognized that it was "equally plausible" that a reasonable juror could have interpreted the question as "Is this your, *the jury's* answer?" *Id.* Thus, an affirmative answer could mean either "Yes, that was our answer, because we could not achieve unanimity on the existence of that factor"

or "Yes, that was my answer, but only because I could not get the others to unanimously agree that this mitigating circumstance existed." *Id.*

Similarly in the case now before us, the jurors could have understood the court's question of "Is this your verdict?" to mean either (a) "Is this the outcome that you, *personally,* wanted?" or (b) "Is this the outcome that you, *as a jury,* reached upon following the instructions?" While the trial judge may have meant the latter, the jury could have easily understood the question to mean the former—particularly since they had already given their collective verdict as a jury, and since there was an obvious 11 to 1 split among the jurors on one of the steps in the four-step process.[4] When defense counsel at that point began to raise exactly this argument with the trial court—that is, that the jurors' responses to the poll question could merely reflect a lack of agreement among themselves regarding their *personal* views as to one of the necessary steps—he was cut off by the trial judge, who interjected: "No, it either is or is not their verdict.... I'm refusing to accept this. Obviously, this is not their verdict."

Before rejecting the life verdicts, however, the judge should have asked further and more detailed polling questions of the jurors, carefully tailored to the situation at hand, in an attempt to identify the point at which the jurors lacked unanimity and thereby clarify their actual intent.[5] For

---

**4.** Appellant contends that the jury's 11 to 1 split came at Step 2 of the process, the question of whether the evidence in aggravation of punishment warrants imposition of a death sentence. Although the record does not reflect what, if any, statutory aggravating circumstances the jury may have found in its initial life verdicts, Appellant conceded at oral argument there is no plausible possibility that the jury's split could have come at Step 1 of the process, since the State's evidence in the

case proved beyond a reasonable doubt the existence of at least one statutory aggravating circumstance—namely, that each murder took place during the commission of another unlawful homicide.

**5.** The court should have polled to determine if each of the jurors found at least one statutory aggravator (Step 1). If "yes," then the court should have polled to determine if each of the jurors found that the facts in aggravation of

without further clarifying questions in such a situation, there is too great a risk that a jury which has in fact *properly arrived* at a life imprisonment verdict (due to a lack of unanimous agreement as to either Step 1 or Step 2) will misunderstand the ambiguous polling question, will be confused as to the reason they are being sent back for further deliberations after responding to the question as they did, and as a result will mistakenly assume that the only possible proper verdict—given their internal disagreement as to Step 1 or Step 2, and the court's refusal to accept their original life verdict—is a "deadlocked" verdict.

We conclude that there is a very real and significant possibility that that is what occurred in this case. In reaching this conclusion, we need not rely on the Meyer affidavit.[6] Rather, we find particularly significant the explanation given by the jury foreperson when, after the jury had returned its second verdict, changing from life imprisonment to "deadlocked," the trial judge inquired about the reason for the change:

> FOREPERSON: Yes, Your honor. We misunderstood as far as unanimously agreeing upon a verdict. **What we understood was that if we did not agree on one then we would have to vote the other way.** But we were not all in agreement of the other verdict so we misunderstood. And we decided with that misunderstanding that we would, because we could not agree on a decision unanimously, that we would give it to the Court.

(emphasis added)

The foreperson's explanation regarding the jury's change in its verdict-although it is itself ambiguous, and open to two possible different interpretations-was a red flag that should have raised immediate concerns in the court's mind that the jury may have actually "got it right" the first time and then, due to a misunderstanding, "got it wrong" the second time. The foreperson's answer clearly raised that very real and disturbing possibility. The answer could easily be interpreted to mean that the jurors had originally understood-correctly-that if they did not all agree on one of the first two steps in the process, they would have to return a verdict of life imprisonment, but then after the ambiguous polling question and the court rejected their life verdicts, they came to believe that they must have originally *misunder-*

---

punishment warranted the death penalty (Step 2). If such a polling inquiry revealed that one of the jurors (Mr. Meyer) did not agree that the facts in aggravation warranted a death sentence, then the court would have known that the jury's life sentences in fact reflected a proper verdict under the law. If, on the other hand, such a polling question had revealed that the jurors unanimously agreed that the facts in aggravation of punishment warranted a death sentence, then the court would have been justified in concluding that the jurors had failed to properly follow the instructions and in returning them for further deliberations, since any lack of unanimity among the jurors as to either Step 3 or Step 4 should have led to "deadlocked" verdicts rather than verdicts of life imprisonment.

6. It is well settled that once a verdict has been rendered, a juror may not impeach the verdict with oral or written testimony of any thought process, partiality, or conduct that occurred inside or outside the jury room. *See State v. Johnson*, 968 S.W.2d 123, 134 (Mo. banc 1998). A juror's affidavit attempting to impeach a verdict cannot be considered. *Amrine v. State*, 785 S.W.2d 531, 535–536 (Mo. banc 1990). Appellant argues that Mr. Meyer's affidavit is really "in support of" the jury's first verdict in this case, and that the rule is equally well settled in Missouri that a juror may give an affidavit to support a verdict, although not to destroy it, citing, *inter alia, Chrum v. St. Louis Public Service Co.*, 242 S.W.2d 54, 56 (Mo.1951), and *State v. Perry*, 643 S.W.2d 58, 61 (Mo.App.1982).

stood, and so, with that lack of understanding, they gave it to the court to decide.

After the foreperson gave this answer, defense counsel requested that the jurors be polled to ascertain if there had been a unanimous finding as to Step 1 and a unanimous finding as to Step 2. When the prosecutor objected, the court sustained the objection and accepted the "deadlocked" verdicts. We find that under the unique circumstances presented by this case, the court erred and abused its discretion in refusing to allow the follow-up polling questions Appellant requested, which would have clarified—and probably removed—the cloud of doubt and uncertainty surrounding the jury's actual understanding and intent.[7]

At present, that cloud of doubt and uncertainty is simply too great to permit the court's sentences of death in this case to stand. The Supreme Court has made clear that, because a death sentence is qualitatively different from any other punishment, there must be a heightened degree of reliability, in the sentencing determination, when the death sentence is imposed. *See Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Under the unique circumstances of this case, the death sentences imposed by the trial court are insufficiently reliable because there is too great a possibility that the jury's original verdict of life imprisonment was in fact a proper verdict under the law and the instructions given, but was rejected by the court due to an ambiguous and inadequate polling question, and that the jury's second verdict of "deadlocked" was the result of misunderstanding caused by

the court's rejection of their original verdict.

The State contends that there is an alternative possible interpretation of the foreperson's answer regarding why the jury changed its verdict after the court refused to accept its first verdict. The State argues that the foreperson's answer could be interpreted as meaning that the jury originally "misunderstood the law, thinking that they were always required to sign the verdict for life imprisonment" unless they unanimously agreed on a verdict of death. Further, the State argues, if the jurors had such a fundamental misunderstanding of the law and the instructions prior to returning their first verdict, and if their lack of unanimity (the 11–to–1 split among the jurors) came at either Step 3 or Step 4 in the decision-making process rather than at Step 1 or Step 2, then the court was right to reject their original verdict and send them back for further deliberations, because such a scenario would necessarily mean the original verdict should have been a verdict of "deadlocked" rather than life imprisonment.

We must acknowledge that the State's interpretation of the foreperson's explanation for the jury's change in verdicts could, conceivably, be correct. But the fact that there are two possible interpretations of the foreperson's answer, both plausible, simply highlights the fact that under the special circumstances of this case, there is considerable doubt and uncertainty regarding the jury's verdict.

The State also cites Rule 29.01(d), which states: "Poll of Jury: When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon

---

7. We realize that in so ruling the trial judge, who consistently displayed a concern for fairness throughout the course of the trial, did his best in dealing with a very unusual and diffi-

cult situation, one for which there was no prior case law directly on point, and for which Rule 29.01(d) in its present form provides no meaningful guidance.

the poll there is not unanimous concurrence, the jury may be directed to return for further deliberations or may be discharged." We frankly acknowledge that Rule 29.01(d) is deficient in its current form, in that it does not specifically address the type of situation presented by this case. However, nothing in the wording of that rule precludes a trial court, in a capital sentencing proceeding such as this one, from conducting a more detailed polling inquiry to determine whether the initial apparent lack of a "unanimous" verdict merely reflects lack of unanimous agreement among the jurors *in their individual opinions* regarding either Step 1 or Step 2—in which case the law mandates that the jury *as a collective unit* must concur in returning a verdict of life imprisonment.

The State further contends it is well-established that that when a jury poll reveals the verdict is not unanimous, or when a verdict is seemingly inconsistent or ambiguous, "the jury should be sent back for further deliberations to resolve the ambiguity," citing and relying primarily on *State v. Peters,* 855 S.W.2d 345 (Mo. banc 1993) and *State v. Lashley,* 667 S.W.2d 712 (Mo. banc 1984). However, neither *Lashley* nor *Peters* is precisely on point with the case at hand.

In *Lashley,* on the face of the verdict, the jury's verdict was not proper in form as to the statutory aggravating circumstances and could not possibly be a correct verdict. *State v. Lashley,* 667 S.W.2d at 715. The trial court told the jury its verdict was not proper in form, and directed the jury to retire and re-read the instructions. *Id.* They then returned a verdict in proper form. Here, in contrast, after refusing to accept the jury's initial verdict and sentences of life imprisonment based on an ambiguous polling question, the court ordered the jury to return to further deliberations without first offering any

clarifying questions or instructions, and thus without giving the jury any hint as to the problem with its initial verdict.

*Peters* was an "inconsistent verdict" case. The jury's initial verdict form was a conviction of armed criminal action but an acquittal of the underlying assault charge on which the armed criminal action count was based. *State v. Peters,* 855 S.W.2d at 347. The trial court refused to accept the verdict, told the jury it had not followed the court's instructions, and ordered it to retire and read the instructions. *Id.* The jury later returned with guilty verdicts on both counts. On appeal, this Court held that the trial court had "acted properly in sending the matter back to the jury for further consideration." *Id.* at 348. *Peters* can be read as standing for the proposition that when an inconsistency appears on the face of a verdict, the safest and best way to ask the jury to resolve that inconsistency ordinarily is to send the jurors back for further deliberations until they reach a proper verdict. *See id.* at 348–349.

Here, however, even though the initial polling question of "is this your verdict?" appeared to indicate an 11–to–1 lack of unanimity among the jurors, this did not necessarily indicate an inconsistent verdict, given that in the unique context of a capital sentencing case, any lack of unanimity among the jurors regarding their individual opinions as to either Step 1 or Step 2 can reflect—indeed, under the law, it mandates—a proper verdict of life imprisonment. In such a case, if a trial judge simply refuses to accept the life verdicts based on the initial ambiguous polling question and then sends the jury back for further deliberations without any further attempt at clarification, this runs the risk of sending a tacit message to the jury that their earlier verdicts were not correct, and that the jury therefore must arrive at a different result. As we stated in *Peters:*

"When the trial judge refuses to accept a jury's verdict and resubmits the case, there is a danger that the jury will be unusually susceptible to reading into the judge's comments an inference that the judge, in rejecting their verdict, is looking for a particular result." *Id.* at 349.

We hold that in the special context of a capital sentencing trial, at which the jury's announced verdict is life imprisonment and the jury is then polled and that polling reveals what may at first appear to be the lack of a unanimous verdict, further polling questions must be asked. Those questions must reasonably attempt to clarify and determine whether the polling actually reflects nothing more than a lack of unanimity among the jurors *in their personal opinions* regarding either Step 1 or Step 2 of the decision-making process, and thus reflects a proper and valid verdict of life imprisonment by the jury *as a collective unit.* That did not occur in this case.

Accordingly, the sentences of death are reversed, and the cause is remanded for a new sentencing hearing.[8] Because Appellant has been granted a new sentencing hearing, we need not review the other claims of error raised in this appeal.

All concur.

---

**8.** In light of the disposition of this appeal, we need not address any issue concerning the possible applicability of the Supreme Court's decision in *Ring v. Arizona,* —— U.S. ——, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), to the circumstances of this case.