**STATE of Missouri, Respondent,**

v.

**Joseph WHITFIELD, Appellant.**

**No. SC 77067.**

Supreme Court of Missouri,
En Banc.

June 17, 2003.

Charles M. Rogers, Cheryl A. Pilate, Kansas City, C. John Pleban, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stephen D. Hawke, Asst. Atty. Gen., Jefferson City, for respendent.

## ON MOTION TO RECALL MANDATE

LAURA DENVIR STITH, Judge.

In 1994, a jury convicted Joseph Whitfield of first-degree murder, but could not agree on punishment during the penalty phase, voting 11 to 1 in favor of life imprisonment.[1] The judge then undertook the four-step process required by section 565.030.4 [2] for determining punishment. He found the presence of statutory and non-statutory aggravating circumstances, determined these circumstances warranted death, considered whether there were mitigating circumstances and found they did not outweigh the circumstances in aggravation, and decided under all the circumstances to impose a death sentence. This Court affirmed the convictions and sentences and denied post-conviction relief. *State v. Whitfield*, 939 S.W.2d 361 (Mo. banc 1997), *cert. denied*, 522 U.S. 831, 118 S.Ct. 97, 139 L.Ed.2d 52 (1997).[3]

Last year, in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court held that the Sixth Amendment entitles "[c]apital defendants ... to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589, 122 S.Ct. 2428. Mr. Whitfield contends his right under the Sixth and Fourteenth Amendments, as set out in *Ring*, was violated because the judge rather than the jury made the factual determinations on which his eligibility for the death sentence was predicated. This Court agrees.

Section 565.030.4 requires that the trier of fact engage in a four-step process in determining whether a death sentence shall be imposed. As discussed below, the first three of these steps require factual findings be made in order to render the defendant eligible for the death penalty. Here, the jury deadlocked, and, as required by section 565.030.4, the judge rather than the jury made the requisite factual findings for imposition of a sentence of death. This violated Mr. Whitfield's right to have a jury determine the facts rendering him eligible for death.

This Court therefore recalls its mandate affirming his conviction and applies *Ring* to invalidate his sentence of death because there is a conflict between this Court's affirmance of a court-imposed death sentence on Mr. Whitfield's direct appeal and the constitutional principles set out in *Ring*, under the test set forth in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Under section 565.040, the only possible sentence is life imprisonment. Accordingly, the Court's mandate is recalled, the sentence of death is reversed, and this Court sets aside the sentence of death and resentences the defendant to life imprisonment without eligibility for probation, parole, or release except by act of the Governor.

## I. MISSOURI CAPITAL DEFENDANTS ARE ENTITLED TO HAVE A JURY DETERMINE THE FACTS RENDERING THEM ELIGIBLE FOR THE DEATH PENALTY UNDER SECTION 565.030.4

*A. Ring Entitles a Capital Defendant to a Jury Determination of the Facts on*

---

1. The jury also found Mr. Whitfield guilty of armed criminal action for which he received a life sentence.

2. All statutory references are to RSMo 1994 unless otherwise indicated.

3. The facts underlying Mr. Whitfield's crimes and convictions are set out in detail in this Court's prior opinion and will not be repeated here.

*Which Eligibility for a Death Sentence is Predicated.*

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), decided three years after this Court affirmed Mr. Whitfield's conviction and sentence, the United States Supreme Court held that the Sixth Amendment does not permit a defendant to be "expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi*, 530 U.S. at 483, 120 S.Ct. 2348.

Numerous courts and commentators thereafter suggested that the principles underlying *Apprendi* were inconsistent with the principles underlying the Supreme Court's decision in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), that a judge could determine the aggravating facts necessary to impose the death penalty once a jury convicted defendant of first-degree murder. They were correct.

Two years later, the Supreme Court applied the principles underlying *Apprendi* to the capital sentencing setting. The Court reasoned that, "[c]apital defendants, no less than non-capital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589, 122 S.Ct. 2428.[4] Further, it found that Arizona's practice of labeling aggravating circumstances as sentencing factors rather than as elements of the offense of capital murder was a matter of form over substance and that, under Arizona's statutory scheme, "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense.' " *Id.* at 609, 122 S.Ct.

2428, *quoting, Apprendi,* 530 U.S. at 494, n. 19, 120 S.Ct. 2348.

Applying these principles, the Supreme Court invalidated Arizona's capital sentencing scheme because it permitted a judge, rather than a jury, to determine the presence of aggravating factors required by Arizona law for imposition of the death penalty following a jury adjudication of a defendant's guilt of first-degree murder. In so holding, it extended to the capital sentencing setting *Apprendi's* holding that "the Sixth Amendment does not permit a defendant to be 'expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.' " *Id.* at 588–89, 120 S.Ct. 2348, *quoting, Apprendi,* 530 U.S. at 483, 120 S.Ct. 2348.

█ The Supreme Court held that not just a statutory aggravator, but every fact that the legislature requires be found before death may be imposed must be found by the jury. And, in determining which factors fall within this rule, *Ring* cautioned that, "the dispositive question . . . 'is one not of form, but of effect.' " *Id.* at 602, 122 S.Ct. 2428, *quoting, Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it must be found by a jury beyond a reasonable doubt." *Id.* at 602, 122 S.Ct. 2428.

Because Mr. Ring did not argue that Arizona's sentencing scheme required the jury to make a factual finding as to mitigating factors, the Supreme Court declined to specifically address whether a jury was also required to determine whether mitigating factors were present that called for leniency. *See Ring,* 536 U.S. at 597, n. 4, 122 S.Ct. 2428. Instead, it set out the general principle that courts must use in

---

**4.** *Ring* thus overruled *Walton.*

applying *Ring* to determine whether a particular issue must be determined by the jury or can be determined by a judge, stating, "[c]apital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589, 122 S.Ct. 2428.

On remand, applying these principles, the Supreme Court of Arizona rejected the contention that the requirements that mitigating circumstances be considered and weighed against aggravators were not factual predicates for imposition of the death penalty. *See State v. Ring,* 204 Ariz. 534, 65 P.3d 915, 942–43 (2003) (*Ring II*). It held, therefore, that, even if the presence of a statutory aggravator was conceded or not contested, resentencing would be required unless the court found that the failure of the jury to make these factual findings was harmless on the particular facts of the case. *Id.*

*B. Under Section 565.030.4 a Defendant is Eligible for the Death Penalty Only if the Jury Makes the Factual Determinations Set Out in Subdivisions 565.030.4(1), (2), and (3).*

The State and Mr. Whitfield agree that, under *Ring,* a jury must determine all facts on which the legislature has predicated imposition of the death penalty. They also agree that sections 565.020 and 565.030 set out the requirements for imposition of the death penalty in Missouri. Section 565.020.2 provides that the punishment for first-degree murder shall be either death or imprisonment for life without eligibility for probation or parole. *Sec.* 565.020.2. Section 565.030.2 requires that, in cases in which the state seeks the death penalty, the case shall be tried in two phases. In the first phase, the jury shall determine guilt. *Sec.* 565.030.2. Section 565.030.4 then provides that, "[i]f the trier ... finds the defendant guilty of murder in

the first-degree, a second stage of the trial shall proceed at which the only issue shall be the punishment to be assessed and declared." *Sec.* 565.030.4.

In the second, or "penalty" phase, the jury is required to be instructed to follow the four-step process set out in section 565.030.4:

> The trier shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor:
>
> (1) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances set out in subsection 2 of section 565.032; or
>
> (2) If the trier does not find that the evidence in aggravation of punishment, including but not limited to evidence supporting the statutory aggravating circumstances listed in subsection 2 of section 565.032, warrants imposing the death sentence; or
>
> (3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or
>
> (4) If the trier decides under all of the circumstances not to assess and declare the punishment at death.

*Id.* Section 565.030.4 on its face requires that steps 1, 2, 3, and 4 be determined against defendant before a death sentence can be imposed. *Id; see Whitfield,* 837 S.W.2d 503, 515 (Mo. banc 1992).

Step 1. Step 1 requires the trier of fact to find the presence of one or more statutory aggravating factors set out in section 565.032.2. Both the State and Mr. Whitfield agree that this is a fact that normally

must be found by the jury in order to impose a sentence of death.

The State contends that steps 2, 3, and 4 merely call for the jury to give its subjective opinion as to whether the death penalty is appropriate, however, not to make findings as to whether the factual predicates for imposing the death penalty are present. It urges that the principles set out in *Ring* are not offended even if the judge rather than the jury determines those three steps. This Court disagrees.

■ Step 2. Step 2 requires the trier of fact (whether jury or judge) to find that the evidence in aggravation of punishment, including but not limited to evidence supporting the statutory aggravating factors, warrants imposition of the death penalty. As noted, the State argues that this step merely calls for a subjective opinion by the trier of fact, not a finding. But, the State fails to note that this Court rejected this very argument in its opinion on Mr. Whitfield's appeal of his initial conviction, in which it remanded for the new trial at issue here. In that decision, this Court held that step 2 requires a "finding of fact by the jury, not a discretionary decision." *Whitfield*, 837 S.W.2d at 515. This holding is supported by the plain language of the statute. In order to fulfill its duty, the trier of fact is required to make a case-by-case factual determination based on all the aggravating facts the trier of fact finds are present in the case. This is necessarily a determination to be made on the facts of each case. Accordingly, under *Ring*, it is not permissible for a judge to make this factual determination. The *jury* is required to determine whether the statutory and other aggravators shown by the evidence warrants the imposition of death.[5]

■ Step 3. In step 3 the jury is required to determine whether the evidence in mitigation outweighs the evidence in aggravation found in steps 1 and 2. If it does, the defendant is not eligible for death, and the jury must return a sentence of life imprisonment. While the State once more argues that this merely calls for the jury to offer its subjective and discretionary opinion rather than to make a factual finding, this Court again disagrees.

The analysis undertaken in three recent decisions by other state courts of last resort, interpreting similar statutes, is instructive. In *Woldt v. People*, 64 P.3d 256 (Colo.2003), the Supreme Court of Colorado reversed the death sentences of two capital defendants after determining that Colorado's three-judge capital sentencing statute was unconstitutional in light of *Ring*. Colorado's death penalty statute, like Missouri's, requires the fact-finder to complete a four-step process before death may be imposed. First, at least one statutory aggravator must be found. Second, whether mitigating factors exist must be determined. Third, mitigating factors must not outweigh the aggravating factors. Finally, whether death is the appropriate punishment is considered.

The Supreme Court of Colorado described the first three of these four steps as findings of fact that are "prerequisites to a finding by the three-judge panel that a defendant was eligible for death." *Woldt*, 64 P.3d at 265. It noted that states are sometimes grouped into "weighing states" that require the jury to weigh the aggravating circumstances against those in mitigation in arriving at their determination of punishment, and "non-weighing states." It explained that, while in steps 1, 2, and 3 the jury is permitted to consider

---

**5.** In 2001, when the legislature revised section 565.030 to prohibit the execution of the mentally retarded, it also eliminated step 2 as a required separate finding. *Sec.* 565.030, RSMo Supp.2002.

and weigh aggravators and mitigators, and to that extent Colorado's process is like that used in weighing states, Colorado is a non-weighing state in that, in step 4, in which the jury decides whether to impose death or to give a life sentence, the jury is permitted to consider all of the evidence without being required to give special significance to the weight of statutory aggravators or mitigators. *Id.* at 263–64. This last step thus "affords the sentencing body unlimited discretion to sentence the defendant to life imprisonment instead of death." *Id.* at 265. Because Colorado's death penalty statute required a three-judge panel to make the first three of these findings, the statute was declared unconstitutional. *Id.* at 266–67.

Similarly, in *Johnson v. State*, 59 P.3d 450 (Nev.2002), Nevada's Supreme Court considered the constitutionality of its capital sentencing scheme in light of *Ring*. Its sentencing scheme provides for a three-judge panel to determine punishment if the jury is unable to do so. *Johnson* noted that Nevada "statutory law requires two distinct findings to render a defendant death-eligible: 'the jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.'" *Johnson*, 59 P.3d at 460 (citation omitted).

*Johnson* determined the requisite statutory finding that the mitigating circumstances are not sufficient to outweigh the aggravating circumstances is at least "in part a factual determination, not merely discretionary weighing." *Id.* at 460. It held that, as a result, the rule announced in *Ring* required a jury rather than a judge to determine the mitigating as well as the aggravating factor issues. *Id.*

Finally, on remand from the United States Supreme Court, the Supreme Court of Arizona rejected the state's contention that the requirement of Arizona law—that the court weigh mitigating circumstances against aggravating circumstances—did not require a factual determination, stating:

> In both the superseded and current capital sentencing schemes, *the legislature assigned to the same fact-finder responsibility for considering both aggravating and mitigating factors, as well as for determining whether the mitigating factors, when compared with the aggravators, call for leniency.* Neither a judge, under the superseded statutes, nor the jury, under the new statutes, can impose the death penalty unless that entity concludes that the mitigating factors are not sufficiently substantial to call for leniency. A.R.S. [sections] 13–703.E (Supp.2002) and 13–703.F (Supp.2001). The process involved in determining whether mitigating factors prohibit imposing the death penalty plays an important part in Arizona's capital sentencing scheme.

*Ring II*, 65 P.3d at 943 (emphasis added). The Court continued:

> We will not speculate about how the State's proposal [to allow the judge to make these findings] would impact this essential process. *Clemons v. Mississippi*, 494 U.S. 738, 754, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990) ('In some situations, a state appellate court may conclude that peculiarities in a case make appellate … harmless error analysis extremely speculative or impossible.'); *see also Johnson v. Nevada*, 59 P.3d 450 (Nev.2002) (as applied to Nevada law, *Ring* … requires [a] jury to weigh mitigating and aggravating factors under Nevada's statute requiring the fact-finder to further find whether

mitigating circumstances are sufficient to outweigh the aggravating circumstances).

*Id.* Accordingly, the Court held that, even were the presence of a statutory aggravator conceded or not contested, resentencing would be required unless the court found that the failure of the jury to make these factual findings was harmless on the particular facts of the case. *Id.* This was a necessary result of applying *Ring's* holding that "[c]apital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589, 122 S.Ct. 2428.

Missouri's steps 1, 2, and 3 are the equivalent of the first three factual determinations required under Colorado's death penalty statute, so that, as in Colorado, the jury is told to find whether there are mitigating and aggravating circumstances and to weigh them to decide whether the defendant is eligible for the death penalty. These three steps are also similar to the aggravating and mitigating circumstance findings required under Nevada and Arizona law. As in those states, these three steps require factual findings that are prerequisites to the trier of fact's determination that a defendant is death-eligible.

■ Step 4. Finally, in step 4 of section 565.030.4, the trier of fact is instructed that it must assess and declare the punishment at life imprisonment if it decides under all of the circumstances not to assess and declare the punishment at death. As under Colorado's statute, it is not until this fourth step that the trier of fact is given discretion to make the final determination whether to give a life sentence even if he or she has already found that the aggravators and mitigators would qualify defendant for imposition of the death penalty. As in Colorado, Missouri is considered a non-weighing state because of the discretion given to the jury at this point to impose a life sentence without regard to the weight it gave to aggravators and mitigators it found. *See Whitfield*, 837 S.W.2d at 515 ("The jury does not make any discretionary decision in imposing the death penalty. On the other hand, the jury is given the constitutionally-required unlimited discretion to exercise mercy and reduce the sentence to life. [*Sec.*] 565.030.4(4)").

*C. The Trial Judge Erred in Himself Making the Factual Findings that are a Predicate to Imposition of Missouri's Death Penalty.*

■ Turning to how these four steps were carried out here, the record reveals that Mr. Whitfield's jury returned a verdict stating that it could not agree on punishment. The record reveals that the jury was split 11 to 1 in favor of life imprisonment. When a jury returns a verdict stating the jurors cannot decide upon punishment, section 565.030.4 requires the judge to decide punishment and provides that "[t]he court shall follow the same procedure as set out in this section [steps 1–4] whenever it is required to determine punishment for murder in the first degree." *Sec.* 565.030.4. The statute required the judge to independently go through the four statutory steps and make his or her own determination whether the death penalty or life imprisonment should be imposed.

As required by section 565.030.4, once the jury deadlocked on Mr. Whitfield's punishment, the trial judge independently went through each of the four statutory steps, independently determined each fact against Mr. Whitfield, and imposed a death sentence. As a result, the death sentence imposed on Mr. Whitfield was not based on a jury finding of any fact, but rather was entirely based on the judge's findings that all four steps favored imposition of

the death penalty. *See sec.* 565.030.4. This process clearly violated the requirement of *Ring* that the jury rather than the judge determine the facts on which the death penalty is based.[6]

### D. The Error Was Not Harmless.

■ Violation of *Ring* may not in itself automatically invalidate imposition of the death penalty. For, while *Ring* requires that a jury rather than a judge make the factual findings necessary for imposition of a death sentence, it implies that a court may find that the failure to require jury findings was harmless error. *Ring,* 536 U.S. at 609, n. 7, 122 S.Ct. 2428. We therefore turn to that issue.

■ In determining whether federal constitutional error may be considered harmless, Missouri has followed the test set out by the United States Supreme Court in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See, e.g. State v. Driscoll,* 55 S.W.3d 350, 356 (Mo. banc 2001). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24, 87 S.Ct. 824. Under this test, the "beneficiary of a constitutional error," the State, must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.*

■ Step 1. In some other case, in which the facts on which the jury based its finding of statutory aggravators were not prior convictions, a harmless error analysis would have to be undertaken in step 1 based on the above principles. On the facts of this case, however, it was not error, harmless or otherwise, for the judge to find the presence of statutory aggravators under step 1, because here, the statutory aggravators submitted were Mr. Whitfield's previous convictions for second-degree murder and manslaughter. *Ring* and *Apprendi* do not overrule prior Supreme Court case law holding that the presence of prior convictions, which are a matter of court record, may be found by the judge rather than by the jury without violating the Sixth and Fourteenth Amendments. That law thus governs here.[7]

Step 2. Whether the trial court's finding of step 2 was harmless error beyond a reasonable doubt is a much more difficult issue for the State. Applying step 2, and in accordance with MAI–CR3d 313.42, Instruction No. 24 informed the jury that if it found a statutory aggravator, then it would be its "duty to decide whether the aggravating circumstances are sufficient to warrant the imposition of death as a punishment of defendant."

Here, the jury was instructed that it could consider all the evidence, including statutory and non-statutory aggravators, in making this decision and that if the jury

---

6. Judge Price's separate opinion ignores the fact that this constituted constitutional error when the opinion suggests that Mr. Whitfield has not met his burden of proving that constitutional error occurred.

7. *See Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348 (*"Other than the fact of a prior conviction,* any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") (emphasis provided); *Ring,* 536 U.S. at 597, n. 4,

122 S.Ct. 2428 ("Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstances related to past convictions in his case; Ring therefore does not challenge *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence.").

did "not unanimously find from the evidence beyond a reasonable doubt that those aggravating circumstances you have found warrant the imposition of death as defendant's punishment, you must return a verdict fixing his punishment at imprisonment for life...." Yet, the jury did not return a life sentence but returned a verdict stating that the jurors could not unanimously agree on punishment. The judge then reconsidered the four statutory steps, found them against Mr. Whitfield, and sentenced him to death.

■ In deciding whether the error in permitting the judge rather than the jury to make the second step determination was harmless beyond a reasonable doubt, the Court is cognizant of the fact that normally a jury is presumed to follow the jury instructions. *See e.g. State v. Madison,* 997 S.W.2d 16, 21 (Mo. banc 1999). Here, the jury was instructed to return a verdict of life imprisonment if it could not agree on step 2. The State argues this Court should presume that the jury followed this instruction even though the issue here is the imposition of the death penalty, citing a case applying such a presumption in a death penalty case where the jury could not agree on punishment and the issue of punishment fell to the judge, *State v. Smith,* 944 S.W.2d 901, 919–920 (Mo. banc 1997), *cert. denied,* 522 U.S. 954, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997). *Smith* is distinguishable, however. It permitted a presumption that the jury found the presence of an aggravating factor under step 1. Whether such factors existed was relatively straightforward. *Smith* did not address whether such a presumption could be made as to the findings required in steps 2 or 3.

More importantly, *Smith* was decided prior to *Ring's* holding that the jury must make each factual finding necessary for imposition of a death sentence. *Smith* did

not address whether a constitutionally-mandated factual finding can ever be presumed to have been made, or whether an express finding is required in those circumstances. And, tellingly, it found a presumption proper as to the findings required in step 1 under a standard of review that placed the burden of proof on defendant to prove prejudicial error. *Smith,* 944 S.W.2d at 919–20.

Here, however, because the judgment was entered based on the judge's findings of fact rather than those of the jury, *Ring* was violated, *and the burden shifted to the State to show the Ring error was harmless beyond a reasonable doubt.* A presumption is simply inadequate to meet this high standard, and no affirmative proof sufficient to meet this standard has been offered by the State, as the record is silent in regard to the jury's findings.

Tellingly, perhaps for this reason, the statute does not permit a trial judge to presume, based on the jury's deadlock, that the jury has decided any particular steps against defendant. Rather, the judge must go through each of the four steps and independently make his or her own factual determination as to each step, not merely steps 3 and 4.

Step 3. Even were there a basis for this Court to hold, based on the jury instructions and verdict, that it can be presumed the jury unanimously found against defendant under step 2, and that such a presumption constituted proof beyond a reasonable doubt of harmless error, no similar determination, much less presumption, can be made as to step 3.

In regard to step 3, the jury was instructed that if it found that aggravators warranting the imposition of death were present, "each of you must then determine whether one or more mitigating circumstances exist which outweigh the aggrava-

ting circumstance or circumstances so found to exist." The jury was informed that if all of the jurors agreed that one or more mitigators were present that were sufficient to outweigh the factors in aggravation, then it must return a verdict of life imprisonment.

Unlike for step 2, however, the jury was *not* told in regard to step 3 that it had to return a verdict of life imprisonment if it could not unanimously agree whether the mitigating facts outweighed the aggravating facts. *Sec.* 565.030.4; *see also* MAI–CR3d 313.48; *Thompson,* 85 S.W.3d at 639. Under the instruction, if even one juror, but not all, determined "there is evidence in mitigation of punishment ... which is sufficient to outweigh the evidence in aggravation of punishment ...," the jurors would be unable to agree on punishment and, under the instructions, the jury would be deadlocked and would return a verdict form so stating.

Here, the jury returned a verdict stating that it was unable to agree on punishment. This Court, and any court, can only act on the record, and the record does not show that the jury deadlocked after rather than before it made the requisite finding under step 3.[8]

In sum, Mr. Whitfield's right under the Sixth and Fourteenth Amendments to a jury determination of the facts rendering him eligible for the death penalty was violated, as his death sentence was entered not based on a jury finding of any fact, but rather entirely on the judge's findings. Because the record does not contain any basis for the Court to conclude the jury made the requisite determinations in steps 1, 2, and 3 against Mr. Whitfield before deadlocking, the State is unable to meet its burden of showing that this constitutional error was harmless beyond a reasonable doubt.[9]

## II. RETROACTIVE APPLICATION OF RING TO DEATH PENALTY CASES

 The State argues that, even if Mr. Whitfield's right under the Sixth and Fourteenth Amendments, as recognized in *Ring,* was violated because the judge made the factual findings supporting a sentence of death, *Ring* cannot be applied to Mr. Whitfield's sentence, and this Court's mandate affirming that sentence should not be recalled.

 While this Court has never fully delineated the scope of an appellate

---

**8.** In regard to step 4, the jury was instructed that it must return a verdict of life imprisonment if it unanimously decided under all of the circumstances not to assess and declare the punishment at death. It was not, however, told to return a life verdict if it could not unanimously agree on a death sentence, but rather was instructed to return a deadlocked verdict in such circumstance.

**9.** The confusion that the complex death penalty submission can cause even for a trial judge, much less a jury, is evident from *State v. Thompson,* 85 S.W.3d 635 (Mo. banc 2002). In *Thompson,* the jury returned verdicts for life imprisonment on each of defendant's two counts of first-degree murder. The court then polled the jury, asking each juror, "Is that your verdict?" When all but one stated that it

was not his or her verdict, answering "no," the court refused to accept the life verdicts and ordered the jury to return for further deliberations. Ultimately, the jury deadlocked and sentencing passed to the court, which imposed two death sentences. Because the trial court ordered the jurors to return for further deliberations after they returned verdicts for life imprisonment without first asking the jurors any further questions in an attempt to clarify their intent or ascertain at what point the jurors may have lacked unanimity, this Court reversed the sentences of death and remanded for a new sentencing hearing. *Thompson,* 85 S.W.3d at 640–41. While here, unlike in *Thompson,* the jury did not first return a life sentence, it did divide 11 to 1 in favor of life imprisonment rather than death.

court's power to recall its mandate, it is well-established that, although an appellate court divests itself of jurisdiction of a cause when the court transmits its mandate, jurisdiction may be reacquired by means of " 'the judicial power to recall a mandate for certain purposes.' " *State v. Thompson,* 659 S.W.2d 766, 768 (Mo. banc 1983), *quoting, Reimers v. Frank B. Connet Lumber Co.,* 273 S.W.2d 348, 349 (Mo. 1954). Thus, "our courts have properly recognized that a mandate may be recalled in order to remedy a deprivation of the federal constitutional rights of a criminal defendant." *Thompson,* 659 S.W.2d at 768–769. Most commonly, this rule is applied to recall a mandate when defendant shows that appellate counsel was ineffective. This places the case in the procedural posture it was in at the time of the original appeal, and effective appellate counsel can raise the issues not properly raised on the initial appeal. *See id.*[10]

▇ As *Thompson* noted, however, another instance in which a mandate will be recalled is "when the decision of a lower appellate court directly conflicts with a decision of the United States Supreme Court upholding the rights of the accused." *Id., citing, State v. McReynolds,* 581 S.W.2d 465 (Mo.App.1979); *State v. Nevels,* 581 S.W.2d 138 (Mo.App.1979). *Cf. State v. Teter,* 747 S.W.2d 307, 311 (Mo. App. W.D.1988) (overruling motion to recall mandate where the motion failed to demonstrate that "the decision as rendered abridges any constitutional right of a criminal defendant as declared by the United States Supreme Court").

*McReynolds* and *Nevels* are particularly illustrative of a court's power to recall its mandate when the mandate abridges constitutional rights that have been recognized by the United States Supreme Court. In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the United States Supreme Court held that the systematic exclusion of women in a way that resulted in jury venires averaging less than 15% females violated the Constitution's fair cross-section requirement. *Duren,* 439 U.S. at 360, 99 S.Ct. 664. In both *McReynolds* and *Nevels,* the court of appeals recalled its mandates affirming defendants' convictions in trials in which voir dire had proceeded in a way not permitted under *Duren,* after the Supreme Court held in *Lee v. Missouri,* 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979), that *Duren* was retroactive.

While the State recognizes that *Thompson* allows this Court to recall its mandate if its prior decision conflicts with a United States Supreme Court decision upholding the rights of the accused, the State denies that such a conflict exists, arguing that *Ring* does not apply to cases such as this one, that have become final. Indeed, the State goes so far as to argue that a decision announcing a new procedural right of the accused can *never* be applied to cases on collateral review, asserting:

> Since the [Missouri] Supreme Court decision in *Thompson,* the [United States] Supreme Court's jurisprudence on retroactivity has been greatly simplified by its decision in *Griffith v. Kentucky,* 479 U.S. 413 [314, 107 S.Ct. 708, 93 L.Ed.2d 649] (1987). In *Griffith,* the Supreme Court held that a new rule for the conduct for criminal prosecutions is to be applied retroactively only to cases, state or federal, pending on direct review or not yet final. *Id.* at 328 [107 S.Ct. 708]. Since appellant's appeal was

---

**10.** Such claims now must be raised by motion under Rule 29.15 or Rule 24.035 rather than by motion to recall mandate.

not pending on direct review and it was final in June 2002, *Ring* does not apply retroactively to appellant's case.

The State's argument too narrowly construes both the law applicable in federal courts governing retroactive application of newly stated federal procedural rules and this Court's duty and authority to apply federal constitutional law retroactively.

As to the first concern, *Griffith* did not set a limit, or ceiling, on when new procedural rules will be applied to other cases, but rather a floor. It set out when new procedural rules *must* be applied to other cases, stating, "a new rule for conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, *pending on direct review or not yet final....*" *Griffith*, 479 U.S. at 328, 107 S.Ct. 708 (emphasis added). *Griffith* at no point said that a state *cannot* apply new criminal procedural rules to cases on collateral review—indeed, that issue was not before it, as *Griffith* was a direct appeal.

■ After *Griffith*, the test for when a new constitutional procedural right would be applied to cases on collateral review at first continued to be the three-part analysis developed by the United States Supreme Court in two cases: *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The *Linkletter–Stovall* analysis requires a court to evaluate three factors when determining whether retroactive application should be given to a new constitutional standard. Those factors are:

(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

*Stovall*, 388 U.S. at 297, 87 S.Ct. 1967. The three-part test set forth in these cases is the analysis that this Court historically has applied in determining whether a decision should be applied retroactively. *See e.g. Spidle v. State*, 446 S.W.2d 793 (Mo. 1969); *State v. Ussery*, 452 S.W.2d 146 (Mo.1970); *McCulley v. State*, 486 S.W.2d 419 (Mo.1972).

Two years after *Griffith*, the United States Supreme Court did adopt a new test for determining when *federal* courts will apply new constitutional rules to cases subject to federal habeas review. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Under *Teague*, federal courts may not apply a new constitutional rule retroactively unless the rule is a matter of substantive law or, if procedural, it falls within one of two exceptions: (1) it places "certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe"[11]—for instance, proscribing the death penalty for those who were mentally retarded at the time of their crime, or (2) it establishes procedures that "implicate the fundamental fairness of the trial,"[12] "without which the likelihood of an accurate conviction is seriously diminished." *Id.* at 313, 109 S.Ct. 1060.

*Teague* narrowed the situations in which a federal court will apply a new procedural rule retroactively to cases on collateral review, setting forth a generally applicable test rather than permitting federal courts to continue to make a case-by-case determination based on the *Linkletter–Stovall* factors. There are numerous reasons it adopted this new rule. As the Supreme Court of Nevada noted in *Colwell v. State*, 59 P.3d 463 (Nev.2002):

---

**11.** *Teague,* 489 U.S. at 311, 109 S.Ct. 1060.

**12.** *Id.* at 312, 109 S.Ct. 1060.

In *Teague*, the Supreme Court, instead of focusing on the purpose and impact of a new constitutional rule, looked to the function of federal habeas review, which is to ensure that state courts conscientiously follow federal constitutional standards. The Court determined that this function is met by testing state convictions against the constitutional law recognized at the time of trial and direct appellate review, ... Therefore, once a conviction has become final, federal habeas courts should generally not interfere with the state courts by applying new rules retroactively.

*Id.* at 470.

 As *Colwell* also noted, however, "*Teague* is not controlling on this court, other than in the minimum constitutional protections established by its two exceptions." *Id.* This follows from the fact "[s]tates are free to provide greater protections in their criminal justice system than the Federal Constitution requires." *California v. Ramos,* 463 U.S. 992, 1014, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). For this reason, "[t]he Supreme Court has recognized that states may apply new constitutional standards 'in a broader range of cases than is required' by the Court's decision not to apply the standards retroactively." *Colwell,* 59 P.3d at 470–71, *quoting, Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); *see also State v. Fair,* 263 Or. 383, 502 P.2d 1150, 1152 (1972) ("[W]e are free to choose the degree of retroactivity or prospectivity

which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires").

It is up to each state to determine whether to apply the rule set out in *Teague,* to continue to apply the rule set out in *Linkletter–Stovall,* or to apply yet some other rule appropriate for determining retroactivity of a new constitutional rule to cases on collateral review. So long as the state's test is not narrower than that set forth in *Teague,* it will pass constitutional muster.

While this Court has on occasion cited federal cases dealing with retroactivity that in turn relied on *Teague,*[13] this Court has never been presented with a case requiring it to decide between the *Linkletter–Stovall* and *Teague* tests. Neither has the State asked us to adopt the *Teague* test, nor even cited *Teague* to us in its brief. While Missouri shares many of the policy concerns *Teague* discusses concerning the finality of convictions, these concerns are well protected by the three-factor test set out in *Linkletter–Stovall* and traditionally applied by this Court. Further, the latter test permits this Court to consider the particular facts and legal issues relevant to the specific issue before the Court—for instance, here, to consider that the right asserted is the fundamental right to trial by jury and that the stake is of the highest magnitude—the defendant's life.[14]

**13.** *See e.g. State ex rel. Nixon v. Sprick,* 59 S.W.3d 515, 520 (Mo. banc 2001), *citing, Dukes v. United States,* 255 F.3d 912, 913 (8th Cir.2001) (recognizing that *Apprendi* presents a new rule of constitutional law that is not of "watershed" magnitude and, consequently, will not be applied on collateral review in federal courts).

**14.** In *Teague,* the United States Supreme Court reserved the question whether the new

test it adopted would be applicable to decisions involving the death penalty. *Teague,* 489 U.S. at 314, n. 2, 109 S.Ct. 1060. Ultimately, the Supreme Court determined to apply the rule in death penalty cases also, *Penry v. Lynaugh,* 492 U.S. 302, 313–14, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), but the fact that it did so in a separate decision constituted a recognition that, by its very nature, death is different.

Finally, this case involves a motion to recall mandate. As discussed above, Missouri has traditionally recognized that a motion to recall mandate may be used to obtain relief from convictions and sentences that are inconsistent with federal constitutional rules. *Thompson,* 659 S.W.2d at 768.

For these reasons, as a matter of state law, this Court chooses not to adopt the *Teague* analysis but instead chooses to continue applying the *Linkletter–Stovall* approach to the issue of the retroactivity of *Ring,* an approach that comports better with Missouri's legal tradition.[15] Applying the analysis set out in *Linkletter–Stovall* here, this Court must consider (1) the purpose to be served by the new rule, (2) the extent of reliance by law enforcement on the old rule, and (3) the effect on the administration of justice of retroactive application of the new standards.[16]

The purpose to be served by the rule set out in *Ring* is to ensure a jury of defendant's peers finds each of the factual elements necessary to his conviction and sentence of death. The Supreme Court and this Court have both held that the right to trial by jury is a fundamental right in serious criminal prosecutions. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Spidle v. State,* 446 S.W.2d 793, 794–95 (Mo.1969). In a case not involving the death penalty, the Su-

preme Court held that this was not a sufficient basis in itself to require retroactive application of the rule requiring a jury trial in such cases. *DeStefano v. Woods,* 392 U.S. 631, 633–34, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968). It went on to consider the impact of its new rule on the administration of justice and the extent of reliance on the old rule and determined that the effect was so great that the new rule would not be applied retroactively. *Id.*

By contrast, here, the second and third factors clearly favor retroactivity. Unlike new constitutional rules dealing with Fourth Amendment violations, the rule at issue here will not invalidate any searches or preclude the admission of any evidence. And, unlike in states such as Arizona in which the statutes required judges to determine whether to impose the death penalty, in Missouri juries have always made the decision whether to impose the death penalty except in those few cases in which the jury was unable to reach a verdict. Moreover, under *Griffith, Ring* must be applied to all future death penalty cases and to those not yet final or still on direct appeal.

Thus, only those few Missouri death penalty cases that are no longer on direct appeal and in which the jury was unable to reach a verdict and the judge made the required factual determinations and im-

---

**15.** While *Teague's* restrictive federal approach to retroactivity may effect a "proper allocation of responsibility between the state and federal courts in the area of constitutional criminal procedure" and eliminate the "perceived encroachment of federal habeas on state courts," Mary C. Hutton, *Retroactivity In The States: The Impact of Teague v. Lane On State Postconviction Remedies,* 44 Ala. L.Rev. 421, 449 (1993), it has been suggested that "[t]he Teague test essentially prevents state courts from achieving their goal [of correcting injustice], for through its focus on the impropriety of disturbing a final conviction, it diverts attention from constitutional viola-

tions and prohibits relief except in the very rare case." *Id.* at 450.

**16.** This Court is not the only state court to chose not to adopt *Teague* or to adopt a modified form of *Teague. See e.g. Cowell v. Leapley,* 458 N.W.2d 514 (S.D.1990) ("We find the *Teague* rule to be unduly narrow as to what issues it will consider on collateral review."); *State v. Lark,* 117 N.J. 331, 567 A.2d 197 (1989); *Ex Parte Coker,* 575 So.2d 43 (Ala. 1990); *Colwell v. State,* 59 P.3d 463 (Nev. 2002).

posed the death penalty will be affected by the retroactive application of *Ring*. As a result, the effect of application of *Ring* to cases on collateral review will not cause dislocation of the judicial or prosecutorial system. This Court's preliminary review of its records has identified only five potential such cases.[17]

▮▮▮▮ Even in those five cases, the effect on the administration of justice of retroactive application of *Ring* will be minimal, as is evident from application of the new rule to the instant case. Although the sentence imposed by the trial court is reversed, no new guilt or penalty phase trial need be held.[18] This is because section 565.030.4, for the reasons discussed above, does not permit the death penalty to be imposed unless the fact finder finds the first three factors set out in that subsection against defendant, and as noted, the record only shows that the judge made these findings. Under the principles set out in *Ring*, which apply retroactively to Mr. Whitfield on this motion to recall mandate, the court below violated his constitutional right in making the requisite findings itself and sentencing him to death. The only option was to impose a life sentence.[19]

The State disagrees. It argues that, even if *Ring* applies retroactively, the remedy is to remand for a new penalty phase trial, not to impose a sentence of life imprisonment. In support, the State notes that on remand of *Ring* itself the Arizona

---

17. *State v. Ervin*, 979 S.W.2d 149 (Mo. banc 1998), *cert. denied*, 525 U.S. 1169, 119 S.Ct. 1090, 143 L.Ed.2d 91 (1999); *State v. Morrow*, 968 S.W.2d 100 (Mo. banc 1998), *cert. denied*, 525 U.S. 896, 119 S.Ct. 222, 142 L.Ed.2d 182 (1998); *State v. Lyons*, 951 S.W.2d 584 (Mo. banc 1997), *cert. denied*, 522 U.S. 1130, 118 S.Ct. 1082, 140 L.Ed.2d 140 (1998); *State v. Smith*, 944 S.W.2d 901 (Mo. banc 1997), *cert. denied*, 522 U.S. 954, 118 S.Ct. 377, 139 L.Ed.2d 294, (1997) (all submitted pursuant to RSMo 1994); and *State v. Richardson*, 923 S.W.2d 301 (Mo. banc 1996), *cert. denied*, 519 U.S. 972, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996) (submitted under RSMo 1986). The versions of section 565.030 in effect at the time of these convictions were identical to that in effect at the time of Mr. Whitfield's convictions.

18. *Compare State v. Towery*, 204 Ariz. 386, 64 P.3d 828, 835 (2003) ("Arizona has approximately ninety prisoners on death row whose cases have become final and who received a sentence based upon the aggravating circumstances found by the trial judge and affirmed on appeal. Conducting new sentencing hearings, many requiring witnesses no longer available, would impose a substantial and unjustified burden on Arizona's administration of justice").

19. This Court further notes that even were a recall of mandate not available, defendant would be entitled to the same remedy in habeas corpus. In sentencing Mr. Whitfield to death without a jury finding of factors 1, 2, and 3 against defendant, the court below imposed a sentence in excess of that permitted by law. "If a court imposes a sentence that is in excess of that authorized by law, habeas corpus is a proper remedy." *State ex rel. Osowski v. Purkett*, 908 S.W.2d 690, 691 (Mo. banc 1995), citing, *State ex rel. Dutton v. Sevier*, 336 Mo. 1236, 83 S.W.2d 581, 582–83 (1935). In such a case, the rules regarding preservation of error by raising the error on direct appeal or in authorized post-conviction motions do not apply, for "those waivers do not affect his objection that the sentence exceeds the maximum allowed by law." *Id.* Such an error is jurisdictional, and cannot be waived. *See e.g. Merriweather v. Grandison*, 904 S.W.2d 485, 489 (Mo.App. W.D.1995).

The United States Supreme Court has also refused to find waiver where the claim is based on a decision that, as did *Ring*, announces a new constitutional rule that explicitly overrules a past decision of the Court. *See Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984) ("where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures").

Supreme Court held that new penalty phase trials are permissible. The State suggests that there is no reason why the result should be different under Missouri law. This argument ignores the fundamental distinction between the death penalty processes in Missouri and in Arizona. In Arizona, once a jury determined guilt, a judge determined punishment. Therefore, the defendant in *Ring* and in other Arizona death penalty cases never had the opportunity to have a jury consider penalty phase evidence and determine whether to impose a life sentence or death. It is therefore quite appropriate that the remedy the Arizona courts have ordered is that such a trial be held.

In Missouri, by contrast, Mr. Whitfield and other defendants have always been entitled to jury sentencing under section 565.030.4. As set out in detail above, the jury must undertake four steps in determining defendant's sentence, the first three of which require factual findings. If the jury is unable to find each such fact favors death, then it must impose a life sentence. Here, the record fails to show

that the jury made these findings, but does affirmatively show that the judge entered a judgment of death based on his own findings rather than those of the jury. As stated, under *Ring* and Missouri law, this was error that was not harmless. Therefore, the judge's only option was to impose a sentence of life.

The separate opinion of Judge Price suggests that this is not the case, and that, at least until Missouri's jury instructions require jurors to specify at what point they have deadlocked, by making separate written findings as to each step set out in section 565.030.4, the remedy will be to order a new trial and give the State a second opportunity to convince a different jury to find the facts necessary for imposition of the death penalty. But, Missouri's statutes do not provide for this second bite at the apple.[20]

■ The separate opinion seems to assume that the judgment is based on the jury's factual findings, and the issue is what presumptions can be indulged in about at what point the jury deadlocked.

**20.** The separate opinion cites to the United States Supreme Court's decision in *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003), in which a defendant successfully argued that he should have his conviction reversed and remanded for a new trial due to trial error. He claimed that since in the first trial the jury had deadlocked on sentence and the judge had sentenced him to life, he should be considered to have been acquitted of the death penalty and a life sentence should be the maximum sentence on remand. The Court disagreed, holding that it could not presume at what point in the process the jury had deadlocked on punishment and therefore it was defendant's burden to show where the deadlock came if he wanted to argue that the jury acquitted him of the elements of the death penalty.

This analysis would apply had Mr. Whitfield sought a new trial on the basis of some separate trial error that caused this Court to reverse and remand his conviction, and ar-

gued that the death penalty could not be sought in the new trial. But, here, the error alleged at issue is not some unrelated trial error, but the very entry of a judgment of death based on the judge's findings, not those of a jury, as required by section 565.030. In this circumstance, it is irrelevant whether one can presume from the deadlock that the jury acquitted defendant of the death penalty. Presumptions play no part in this case. The death sentence was unconstitutional, and, the judge was required to enter a sentence of life imprisonment. In this circumstance, it would make defendant's victory a hollow one indeed if this Court were to hold that the remedy for the trial judge's failure to enter a life sentence is to remand to allow the State to seek the death penalty again at a new trial. The remedy must be to correct the error by imposing the sentence the judge should have imposed—life imprisonment without the possibility of probation or parole except by act of the Governor.

But, section 565.030.4 provides that a defendant shall be sentenced to life imprisonment *unless* the jury finds steps 1, 2, 3, and 4 against him or her. It also provides that, when the jury deadlocks, the jury's findings simply disappear from the case and the court is to make its own independent findings. That is what occurred here. Thus, any presumptions as to what the jury may have found are simply irrelevant. Here, the judgment of death, based on the court's findings, constituted constitutional error. For the reasons set out above, that error was not harmless beyond a reasonable doubt.[21] Therefore, had this case been tried after *Ring*, the proper course of action for the judge to follow would have been to sentence defendant to life imprisonment. The fact that the applicability of *Ring* was not determined until later does not change the remedy in the present case. It is still to enter the judgment the trial court should have entered—a sentence of life imprisonment without eligibility for probation or parole.[22]

This result is anticipated, and required, by section 565.040.2, which provides in pertinent part:

> In the event that any death sentence imposed pursuant to this chapter is held to be unconstitutional, the trial court which previously sentenced the defendant to death shall cause *the defendant to be brought before the court and shall sentence the defendant to life imprison-*

*ment* without eligibility for probation, parole, or release except by act of the governor. . . .

*Sec.* 565.040.2 (emphasis added). Because the imposition of Mr. Whitfield's death sentence has been determined to be in violation of his right under the Sixth and Fourteenth Amendments to a jury determination of the facts rendering him eligible for death, section 565.040.2 clearly applies. It expressly states that a defendant whose sentence is vacated on constitutional grounds shall be resentenced to life in prison. It does not, as the separate opinion suggests, state that a defendant shall be sentenced to life imprisonment only if his death sentence is held unconstitutional on the basis that the defendant was never really eligible for the death penalty in the first place, such as defendants who are mentally retarded or as to whom no statutory aggravator applies, and that defendants whose sentences are overturned on procedural grounds shall receive new trials. Rather, it states that "[i]n the event that *any death sentence imposed pursuant to this chapter is held to be unconstitutional,* the trial court ... shall sentence the defendant to life imprisonment." *Id.* (emphasis added).

Mr. Whitfield's death sentence, imposed pursuant to chapter 565, is herein held to be unconstitutional because it violates his right to be sentenced on determinations made by a jury.[23] Section 565.040.2 states

---

**21.** Indeed, even were the error harmless, a trial court has a duty to refuse to intentionally commit error, even "harmless" error. *See State v. Cullen*, 39 S.W.3d 899, 906 (Mo.App. E.D.2001).

**22.** Indeed, perhaps in response to *Ring*, this Spring the Missouri Senate, by a vote of 31 to 0, passed HB 198, which contained an amendment, SA–19, expressly providing for just this result—that if the jury deadlocks, the judge shall enter a life sentence. *Journal of the Senate, May 14, 2003.* Two days later the

Missouri House of Representatives passed the conference report on HB 198 by a vote of 129 to 29. *Journal of the House, May 16, 2003.* The conference report on HB 198 also provided for approval of this amendment, but the bill, which contained numerous other issues also, was laid over in the Senate on the last day of the session. *Journal of the Senate, May 16, 2003.*

**23.** This is to be distinguished from situations like *State v. Mayes*, 63 S.W.3d 615, 635 (Mo. banc 2001), and other cases cited by the sepa-

that in the event that a death sentence imposed pursuant to chapter 565 is held to be unconstitutional, the defendant shall be sentenced to life imprisonment. Mr. Whitfield accordingly is entitled to be resentenced to a term of life imprisonment without eligibility for probation, parole, or release except by act of the governor.

### III. CONCLUSION

For the foregoing reasons, this Court recalls its mandate in *Whitfield*, 939 S.W.2d 361, sets aside Mr. Whitfield's sentence of death, and pursuant to section 565.040.2, Rule 84.14, and this Court's authority under section 565.035.5(2), sets aside the sentence of death and resentences defendant to life imprisonment without eligibility for probation, parole, or release except by act of the governor. In all other respects, the judgment is affirmed as provided in this Court's opinion of January 21, 1997.

WHITE, WOLFF and TEITELMAN, JJ., concur.

PRICE, J., concurs in part and dissents in part in separate opinion filed.

BENTON, J., concurs in opinion of PRICE, J.

LIMBAUGH, C.J., concurs in part in opinion of PRICE, J.

LIMBAUGH, C.J., dissents in separate opinion filed.

WILLIAM RAY PRICE, JR., Judge, concurring in part and dissenting in part.

### I.

I respectfully dissent.

The majority decision concludes that *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires separate jury determinations concerning the first three steps of section 565.030.4.[1] The majority also concludes that *Ring* should apply retroactively in this case.

To this extent, I agree with the majority opinion. I do not agree, however, that automatic commutation of Whitfield's death sentence to life imprisonment is required pursuant to section 565.040. The procedural error that occurred in the penalty phase of Whitfield's trial can be fully cured by remand for a new sentencing phase trial.

### II.

The majority contends that the trial court committed constitutional error in itself making the findings under steps 1, 2, 3, and 4 of section 565.030.4 when the jury did not do so. However, this was error only if the jury deadlocked prior to step 4. If not, the jury made all the necessary factual findings required by *Ring* to determine that Whitfield was death eligible. Any findings thereafter by the judge only confirm his separate agreement with the jury, an additional safeguard.

It is clear that the state has not shown that the jury deadlocked at step 4, after making the required findings at steps 1, 2, and 3. However, it is equally clear that Mr. Whitfield has failed to show that the jury did not find steps 1, 2, or 3. The record is completely devoid of fact regarding at which step the jury deadlocked. The bur-

rate opinion, in which a new trial was ordered because of unrelated trial error of constitutional dimension. Here, as discussed, it is the very entry of the death sentence that is held to be unconstitutional, since made without the very jury findings required for imposi-

tion of the death penalty under Missouri law, and hence the only remedy is to order imposition of the proper penalty—a life sentence.

1. All statutory references are to RSMo 1994 unless otherwise indicated.

den of proof lies on Whitfield, not the state. *See Sattazahn v. Pennsylvania,* 537 U.S. 101, 123 S.Ct. 732, 738, 154 L.Ed.2d 588 (2003) ("Petitioner here cannot establish that the jury or the court 'acquitted' him during his first capital-sentencing proceeding."). Thus, the majority must presume, expressly or not, that the jury deadlocked prior to step 4.

Based upon its presumption, the majority finds constitutional error and invokes section 565.040 to require automatic commutation to a life sentence. However, even assuming the validity of its presumption, the majority reads section 565.040 too broadly and ignores section 565.035.

### A.

Section 565.035 describes this Court's general duty to review death penalty sentences. This section authorizes and allows to this Court the full latitude necessary to remedy error in capital cases by providing three alternatives for resolution. It states in pertinent part:

1. Whenever the death penalty is imposed in any case, and upon the judgment becoming final in the trial court, *the sentence shall be reviewed* on the record by the supreme court of Missouri. . . .

. . . .

2. The supreme court of Missouri shall consider the punishment as well as any errors enumerated by way of appeal.

. . . .

5. The supreme court . . . , *with regard to review of death sentences, shall be authorized to:*

(1) Affirm the sentence of death; or

(2) Set the sentence aside and resentence the defendant to life imprisonment without eligibility for probation, parole, or release except by act of the governor; or

(3) Set the sentence aside and remand the case for retrial of the punishment hearing. A new jury shall be selected or a jury may be waived by agreement of both parties. . . .

Section 565.035 (emphasis added).

Section 565.040, on the other hand, applies in just two very limited situations where only commutation to a life sentence can remedy the error of a substantively unconstitutional sentence. It provides:

1. In the event that *the death penalty* provided in this chapter is held to be unconstitutional, any person convicted of murder in the first degree shall be sentenced by the court to life imprisonment without eligibility for probation, parole, or release except by act of the governor. . . .

2. In the event that any *death penalty sentence imposed* pursuant to this chapter is held to be unconstitutional, the trial court which previously sentenced the defendant to death . . . shall sentence the defendant to life imprisonment without eligibility for probation, parole, or release except by act of the governor. . . .

(emphasis added).

### B.

Sections 565.040 and 565.035 must be read together *in pari materia* to provide this Court with the full panoply of remedies to correct error in capital murder cases. Where either the death penalty itself is unconstitutional, section 565.040.1, or where a death penalty sentence cannot constitutionally be imposed upon a particular defendant, section 565.040.2, situations of substantive unconstitutionality that cannot be corrected by any retrial, the only adequate remedy is to commute the death sentence to life imprisonment. However,

where procedural error occurs that can be fully remedied by a new penalty phase trial, section 565.040 is not necessary and was obviously not intended to be applied.[2]

Section 565.040 was enacted to apply in response to determinations such as *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Section 565.040.1 applies only in the event that the death penalty, in its totality, is deemed unconstitutional, such as in *Furman* or in this Court's decision in *State v. Duren*, 547 S.W.2d 476 (Mo. banc 1977). Similarly, section 565.040.2 governs only where a death sentence cannot constitutionally be imposed upon a particular offender, such as where the offender is mentally retarded, *Atkins*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335; where the offender is not competent, *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); where there is insufficient evidence to sustain the existence of a statutory aggravating circumstance if the sentencer found only one such circumstance, *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); or where a single statutory aggravating circumstance is found to be constitutionally vague, *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

Section 565.040, however, does not apply to situations of mere procedural error, even if such error is rooted in constitutional principles. First, the plain words of the statute limit its application to events in which "the death penalty [in its totality] ... is held to be unconstitutional" or in which "any death sentence imposed [as to a particular offender] ... is held to be

unconstitutional". Second, there is no policy reason to mandate a particular more extreme remedy when a lesser, more moderate remedy, is sufficient to guard the procedural rights of the offender.

Indeed, this Court's precedents indicate that remand for a new penalty proceeding is the appropriate remedy when there is procedural error having constitutional implications during the penalty phase of a trial. In *State v. Mayes*, this Court found a procedural error in the penalty phase from the trial court's failure to give a "no adverse inference" instruction. *State v. Mayes*, 63 S.W.3d 615, 635 (Mo. banc 2001) (citing U.S. Const. amend V). This Court concluded that the procedural error required remand for a new penalty phase, even though the error had constitutional implications. *Id.* at 640. *See also State v. Storey*, 986 S.W.2d 462 (Mo. banc 1999) (same issue and result); *State v. Rhodes*, 988 S.W.2d 521, 528–29 (Mo. banc 1999) (error in prosecutor's penalty phase closing argument having constitutional implications resulted in remand for new penalty phase hearing).

Similarly, in *State v. Thompson*, 85 S.W.3d 635 (Mo. banc 2002), cited by the majority, this Court found the trial court's failure to poll the jury sufficiently about its initial verdict resulted in a constitutionally unreliable sentence. *Id.* at 642 (citations omitted). This Court ordered a new sentencing hearing to remedy the constitutional violation. *Id.* at 644. In so remanding, this Court avoided consideration of an issue under *Ring*. *Id.* at 644 n. 8.

The majority did not find that section 565.030.4 cannot be constitutionally applied simply by requiring explicit jury findings of steps 1, 2, and 3. Nor did it find that a

---

**2.** It is interesting that the majority is concerned that the state might get a "second bite at the apple" when the majority retroactively applies new precedent to a trial that was conducted in accordance with the procedural requirements known at the time and to which Whitfield made no objection.

judge could not constitutionally sentence an offender to death if the jury deadlocked at step 4 of section 565.030.4. Nor did the majority find that it was unconstitutional to assess the death penalty against Whitfield because of any factors individual to him. Rather, the reality of the majority opinion is merely that procedural error, albeit of a constitutional nature, occurred during the sentencing phase of Whitfield's trial. That procedural error can be fully remedied by remand for a new penalty phase trial with separate explicit jury determinations being made for each of the three fact-finding steps of section 565.030.4(1), (2), and (3).

### III.

For these reasons I would remand this case for retrial of the penalty phase and allow a jury to determine the appropriate level of punishment.

STEPHEN N. LIMBAUGH, JR., Chief Justice, dissenting.

I respectfully dissent.

### I.

Preliminarily, I have great concern that the majority has effectively displaced the time-honored principle of finality by permitting Whitfield to challenge the constitutionality of Missouri's death penalty statute for the first time in a motion to recall the mandate. In accordance with established procedures for collateral review of a procedurally defaulted claim, Whitfield instead must seek habeas relief on grounds of cause and prejudice. *Brown v. State*, 66 S.W.3d 721, 726 (Mo. banc 2002).

### A.

As this Court recognized in *State v. Thompson*, 659 S.W.2d 766, 769 (Mo. banc 1983), an appellate court is divested of jurisdiction over a case upon issuance of its mandate, with only limited exceptions. One such exception, and the exception that convinces the majority of the propriety of reasserting jurisdiction over this case, is where "the decision of a lower appellate court directly conflicts with a decision of the United States Supreme Court upholding the rights of the accused." *Id.*

In its abbreviated discussion of the appropriateness of reasserting jurisdiction over Whitfield's claims, the majority cites *State v. McReynolds*, 581 S.W.2d 465 (Mo. App.1979), and *State v. Nevels*, 581 S.W.2d 138 (Mo.App.1979), as "illustrative of a court's power to recall its mandate when the mandate abridges constitutional rights that have been recognized by the United States Supreme Court." The majority explains that in both *McReynolds* and *Nevels*, "the court of appeals recalled its mandates affirming defendants' convictions in trials in which voir dire had proceeded in a way not permitted under *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), after the Supreme Court held in *Lee v. Missouri*, 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979) that *Duren* was retroactive." What the majority fails to acknowledge, however, is that the mandates that were recalled in both of these cases explicitly rejected the particular constitutional claim later recognized by the *Duren* Court. In this respect, the appellate courts' affirming opinions "directly conflict[ed] with a decision of the United States Supreme Court upholding the rights of the accused." *Thompson*, 659 S.W.2d at 769.

By contrast, in this case, Whitfield did not argue on direct appeal that Missouri's capital sentencing procedures are unconstitutional. *See State v. Whitfield*, 939 S.W.2d 361 (Mo. banc 1997). Thus, there is no incongruity between this Court's earlier mandate and *Ring's* subsequent holding. Because the mandate, and the opin-

ion on which it was based, does not uphold, or even address, the constitutionality of the capital sentencing statute, it cannot be said to "directly conflict with a decision of the United States Supreme Court," *Thompson,* 659 S.W.2d at 769, and as such, a recall of the mandate is not appropriate.

Nor is a recall of the mandate appropriate, as the majority suggests, because this Court's decision affirming Whitfield's conviction and sentence resulted in a "deprivation of the federal constitutional rights of a criminal defendant." *Id.* To hold that a prior mandate, that does not facially conflict with a United States Supreme Court decision upholding the rights of the accused, can nonetheless be recalled merely because it is later determined that the conviction or sentence should not have been affirmed in light of a constitutional claim that was not asserted, would be to completely eviscerate the time limitations imposed on raising claims of error on direct appeal and in post-conviction motions. I cannot support such a blatant overhaul of the rules of post-conviction practice.

### B.

As the majority correctly notes, habeas relief is available to a defendant whose sentence is unlawful. *State ex rel. Nixon v. Sprick,* 59 S.W.3d 515, 519 (Mo. banc 2001). However, the majority incorrectly concludes Whitfield would be entitled to habeas relief, despite his procedural default, because "the court below imposed a sentence in excess of that permitted by law." Unlike the cases cited by the majority, the error Whitfield asserts is not jurisdictional in nature. In both *Merriweather v. Grandison,* 904 S.W.2d 485 (Mo.App. 1995), and *State ex rel. Osowski v. Purkett,* 908 S.W.2d 690 (Mo. banc 1995), the trial court had erroneously imposed sentences that exceeded the maximum sentence expressly provided by statute for the

charged offenses. Although the defendants failed to timely challenge the unauthorized sentences, their claims of error were addressed, because a jurisdictional defect cannot be waived. *Merriweather,* 904 S.W.2d at 489; *Osowski,* 908 S.W.2d at 691. In this case, however, the authority to sentence a defendant to death is expressly granted by statute; thus, the court did not impose a sentence in excess of that permitted by law. Rather, the claim of error asserted by Whitfield is grounded on the court's failure to follow the procedures necessary to impose the death sentence under *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

In several different contexts, Missouri courts have recognized that procedural irregularities will not divest the court of authority to sentence a defendant within the range allowed by law. For instance, in *Clay v. Dormire,* 37 S.W.3d 214 (Mo. banc 2000), this Court noted that the defendant's claim that he was improperly denied jury sentencing and that the sentencing court had erroneously considered an expunged prior conviction did not amount to a jurisdictional claim that "the sentence imposed exceeded that authorized by law." *Id.* at 218. Similarly, in *State v. Tincher,* 797 S.W.2d 794 (Mo.App.1990), the court of appeals rejected the argument that the trial court's departure from procedures mandated by statute for imposing enhanced punishment deprived the court of jurisdiction and held that such procedural errors warrant reversal only if the error was prejudicial. *Id.* at 797; *see also State v. Jennings,* 815 S.W.2d 434, 446 (Mo.App. 1991); *State v. Bryant,* 658 S.W.2d 935, 940 (Mo.App.1983).

Although the alleged error did not deprive the sentencing court of jurisdiction to impose death, Whitfield nonetheless may be entitled to have his procedurally defaulted claim addressed in a habeas pro-

ceeding by demonstrating "cause for the failure to timely raise the claim at an earlier juncture and prejudice resulting from the error that forms the basis of the claim." *Brown*, 66 S.W.3d at 726. But in any event, he should be required to follow the firmly established procedures set forth for collateral review. Whitfield "is bound to raise all challenges ... in accordance with the procedures established for that purpose," and none of these procedures, including a motion to recall the mandate, are "designed for duplicative and unending challenges to the finality of a judgment." *State ex rel. Simmons v. White*, 866 S.W.2d 443, 446 (Mo. banc 1993). Yet today this Court has chosen to depart from our established criminal review system by inventing an entirely new avenue for challenging untimely constitutional claims. I decline to follow the majority down this misguided path.

## II.

I further decline to follow the majority's application of *Ring v. Arizona* that mischaracterizes Missouri's capital sentencing scheme. The mandate of *Ring* is simply that a jury must make a finding of "any fact on which the legislature conditions an increase in [the] maximum punishment." 536 U.S. at 589, 122 S.Ct. 2428. I would hold that step 3 of the capital sentencing statute, which directs that the trier conduct a balancing of the aggravating and mitigating circumstances, amounts to neither a factual finding, nor a finding that increases the maximum punishment.

### A.

As noted, Missouri's capital sentencing statute, section 565.030.4, RSMo 1994, requires a four-step process before a death sentence may be imposed:

The trier shall assess and declare the punishment at life imprisonment without eligibility for probation, parole, or release except by act of the governor:

(1) If the trier does not find beyond a reasonable doubt at least one of the statutory aggravating circumstances set out in subsection 2 of section 565.032; or

(2) If the trier does not find that the evidence in aggravation of punishment, including but not limited to evidence supporting the statutory aggravating circumstances listed in subsection 2 of section 565.032, warrants imposing the death sentence; or

(3) If the trier concludes that there is evidence in mitigation of punishment, including but not limited to evidence supporting the statutory mitigating circumstances listed in subsection 3 of section 565.032, which is sufficient to outweigh the evidence in aggravation of punishment found by the trier; or

(4) If the trier decides under all of the circumstances not to assess and declare the punishment at death.

\* \* \*

I agree with the majority that steps 1 and 2—which require that the trier find beyond a reasonable doubt the existence of at least one statutory aggravator that warrants the death penalty—constitute factual findings subject to *Ring's* proscriptions, and I further agree that step 4—which gives the jury unfettered discretion to exercise mercy and reduce the sentence to life—involves a discretionary determination immune from the *Ring* holding. Step 3 is more akin to step 4 than steps 1 and 2.

By requiring the jury to weigh the evidence, that is, to balance and assess the relative degree of the evidence, step 3 entails a wholly subjective and discretionary analysis. *See State v. Smith*, 649 S.W.2d 417, 430 (Mo. banc 1983). In re-

viewing an earlier, but essentially similar version of the capital sentencing statute, this Court stated:

> The purpose of the reasonable doubt standard is to reduce the risk of convictions and executions based on *factual* error.... In Missouri, before a jury can consider a sentence of death, it must unanimously find beyond a reasonable doubt every fact necessary to establish guilt of a capital crime and the existence of at least one statutory aggravating circumstance, [section] 565.012, RSMo Cum.Supp.1982. Once these factual thresholds are crossed, however, the issue ceases to be one of *proof* and becomes one of *discretion:* will the jury, after considering all the evidence and aggravating and mitigating circumstances relevant to the crime and the defendant, recommend a sentence of death or life without eligibility for probation or parole for fifty years. The standard mandated by the Fourteenth Amendment for proof of ultimate facts does not control such an exercise of discretion.

*Smith,* 649 S.W.2d at 430 (emphasis in original). *See also Ex Parte Waldrop,* —— So.2d ——, ——, 2002 WL 31630710, 2002 Ala. LEXIS 336, at *18 (Ala.2002) ("[T]he weighing process is not a factual determination or element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum."); *People v. Prieto,* 30 Cal.4th 226, 133 Cal.Rptr.2d 18, 66 P.3d 1123, 1147 (2003) ("[T]he penalty phase determination 'is inherently moral and normative, not factual.'") (citation omitted); *Ford v. Strickland,* 696 F.2d 804, 818 (11th Cir.1983) ("While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reason-

able doubt or preponderance standard ... the relative weight is not.").

Finally, there is a distinction, albeit a subtle one, between the legislature's directions in these steps. The statute calls for a "finding" in steps 1 and 2, whereas the trier must arrive at a "conclusion" in step 3. These different requirements have different connotations. A finding suggests the ascertainment of an observable fact, *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 852 (1986) (defining "finding" as "the result of a judicial or quasi-judicial examination or inquiry esp[ecially] into matters of fact as embodied in the verdict of a jury or decision of a court, referee, or administrative body ...."), while a conclusion implies the exercise of judgment, *see id.* at 471 (defining "conclusion" as "a reasoned judgment or expression of one: inference...."). In short, Step 3 requires that the trier conduct a balancing of the aggravating and mitigating circumstances and reach a conclusion as to their relative weight. Such a determination necessarily involves the exercise of judgment, not fact-finding.

### B.

Even if the majority is correct and step 3 does entail a factual finding, it cannot be construed as the kind of factual finding under *Ring* that *increases* the maximum punishment. Instead, a finding in favor of the defendant under step 3 acts only to *decrease* the punishment, subjecting an otherwise death-eligible defendant to life imprisonment. The language of the statute bears this out. The factual findings required under steps 1 and 2—whether there exists at least one statutory aggravator and whether that aggravator warrants the death penalty—are findings that are necessary to increase the maximum punishment from life to death. *State v. Worthington,* 8 S.W.3d 83, 88 (Mo. banc 1999) ("The finding of a statutory aggravating

circumstance serves the purpose of determining which defendants are eligible for the death penalty."); *State v. Shaw*, 636 S.W.2d 667, 675 (Mo. banc 1982) ("The jury's finding that one or more statutory aggravating circumstances exist is the threshold requirement that must be met before the jury can, after considering all the evidence, recommend the death sentence."). However, unlike the language in steps 1 and 2, step 3 is not couched as a prerequisite to the imposition of the death penalty. The "finding" required under step 3 is not whether aggravating factors outweigh mitigating factors in order to subject defendant to the death penalty, but whether mitigating factors outweigh aggravating factors in order for defendant to avoid the death penalty despite being death-eligible. *See Brice v. State*, 815 A.2d 314, 322 (Del.2003) (holding that "the weighing of aggravating circumstances against mitigating circumstances does not increase the punishment"); *Torres v. State*, 58 P.3d 214, 216 (Okla.Crim.App. 2002) (holding that it is the "jury's finding of the aggravating circumstance necessary to support a capital sentence, ... not the weighing of aggravating and mitigating circumstances, that authorizes jurors to consider imposing a sentence of death").

Missouri's system of proportionality review for death sentences lends further support for this conclusion. The object of this system is to ensure that the death penalty is warranted in any given case, and "to prevent freakish and wanton application of the death penalty." *State v. Black*, 50 S.W.3d 778, 793 (Mo. banc 2001). Under section 565.035, this Court reviews all death sentences imposed within the state, and in doing so considers "[w]hether the evidence supports the jury or judge's finding of a statutory aggravating circumstance ... and any other circumstance found." It is telling, however, that the Court is not directed to consider the de-

gree to which evidence in aggravation outweighs the evidence in mitigation. If a relative balancing of aggravators and mitigators were necessary to impose the death penalty, it would seem as though this Court, as final arbiter of the propriety of capital punishment, would be obliged to undertake this crucial analysis.

## III.

Having determined that *Ring* does not require a jury finding in step 3, the trial court was justified in imposing the punishment of death. The event that triggers judge sentencing is a jury's inability to arrive at a decision on punishment. The judge is then required to independently repeat the four-step process, but the judge's reconsideration of all four steps is not error. Although under *Ring*, steps 1 and 2 are fact-findings that the jury, not the judge, must make, the jury necessarily made those findings in accordance with the penalty-phase verdict directing instructions. And, as previously explained, once the jury has made these first two findings the defendant is eligible for the death penalty.

The majority, however, holds that the judicial determinations in steps 1 and 2 constituted error, and that the presumption that juries abide by the court's instructions "is simply inadequate" to show that this error was harmless beyond a reasonable doubt. But it is precisely because of this presumption that the judge's finding was not error at all. The verdict directing instructions, which are based on section 565.030.4, RSMo 1994, explicitly provide that if a jury cannot decide unanimously on either step 1 or step 2, it must return a verdict of life without probation or parole. Thus, in the absence of a verdict of life without probation or parole, the jury necessarily found unanimously the ex-

istence of an aggravating factor that warrants the death penalty.

All this is dependent, of course, on the well-settled and indispensable presumption that juries act in accordance with the court's instructions, a proposition that the majority now effectively rejects. In doing so, the majority tacitly overrules well-settled precedent in death cases. For instance, in *State v. Smith*, 944 S.W.2d 901 (Mo. banc 1997), this Court held that because the jury deadlocked on the issue of punishment, it necessarily found the existence of at least one statutory aggravating factor. *Id.* at 919–20. Similarly, in *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988), this Court rejected the argument that a deadlocked jury should be required to delineate the statutory aggravators it has found in order to ensure that all the jurors agreed upon at least one aggravating circumstance before reaching an impasse. *Id.* at 488. In disposing of this argument, this Court held:

> The jury instructions formulated to comply with the requirements of [section] 565.030.4(1), provide the assurance that the jury has found at least one aggravating circumstance. If the jury had not found the existence of any aggravating circumstance, it would have been required to impose a life sentence under MAI–CR 3d 313.40. Only if the jury had initially found the existence of an aggravating circumstance could it, under the instructions, return a verdict announcing that it was unable to agree upon punishment. It is presumed that juries follow their instructions. *State v. Preston*, 673 S.W.2d 1, 7 (Mo. banc), cert. denied, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). As there is already assurance that a jury returning a verdict announcing it cannot agree upon punishment has made the prerequisite finding of at least one aggravating circumstance, procedural due process does not require the jury to submit the aggravating circumstances it has found in writing.

*Id.* This assurance, however, is no longer enough for the majority, which refuses to acknowledge that, in accordance with the verdict directing instructions, the jury made the requisite findings under steps 1 and 2.

The majority's rejection of the presumption that juries follow the court's instructions is based, at least in part, on the perceived "confusion that the complex death penalty submission can cause even for a trial judge, much less a jury." In that regard, the majority relies on this Court's decision in *State v. Thompson*, 85 S.W.3d 635 (Mo. banc 2002), albeit in a footnote. *Thompson*, however, hardly demonstrates the necessity of abandoning the presumption that juries abide by the court's instructions, as the confusion in *Thompson* stemmed from an ambiguous polling question. Here, on the other hand, the instructions are in no way ambiguous. Instruction No. 22, which corresponds to step 1, provided:

> [I]f you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing circumstances exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Division of Corrections without eligibility for probation or parole.

Likewise, Instruction No. 24, which corresponds to step 2, provided:

> If you do not unanimously find from the evidence beyond a reasonable doubt that those aggravating circumstances you have found warrant the imposition of death as defendant's punishment, you must return a verdict fixing his punishment at imprisonment for life by the

Division of Corrections without eligibility for probation or parole.

These instructions are neither complicated nor confusing, and there is simply no reason to believe that a jury—especially a capital jury—did not follow the law.

Our entire system of criminal jurisprudence is premised upon the notion that jurors perform their duties conscientiously and in accordance with the law. *See Marshall v. Lonberger,* 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (quoting *Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979)) ("[T]he 'crucial assumption' underlying the system of trial by jury 'is that juries will follow the instructions given them by the trial judge.' "); *Jackson v. Denno,* 378 U.S. 368, 434, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) ("Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense."). If we can no longer presume that a jury empanelled for the gravest of purposes—that of deciding whether a fellow human being deserves to die—strictly complied with the law while undertaking this solemn task, confidence in every capital sentence handed down in the state of Missouri will be seriously undermined. Accordingly, I am unwilling to disregard the presumption that juries entrusted with making life or death decisions follow the court's instructions, and I will not indulge in the counter-presumption that jurors assigned to perform this grim duty proceed without regard for the strictures of the law.

### IV.

Finally, I wish to address the majority's rejection of the standards articulated by the Supreme Court in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), for determining whether a newly announced constitutional rule should be retroactively applied. Although I realize that this Court is not bound to adopt these standards, I see no reason to depart from *Teague's* sound retroactivity analysis, as the finality considerations that dictated the *Teague* standards have equal force within the context of state court collateral proceedings. *See Thompson,* 659 S.W.2d at 768. Whether at the state or federal level:

> [a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect. The fact that life and liberty are at stake in criminal prosecutions "shows only that the 'conventional notions of finality' should not have *as much* place in criminal as in civil litigation, not that they should have *none.*"

*Teague,* 489 U.S. at 309, 109 S.Ct. 1060 (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attacks on Criminal Judgments,* 38 U. Chi. L.Rev. 142, 150 (1970)).

Under the *Teague* standards, a new procedural rule will not be retroactively applied on collateral review, unless the rule implicates fundamental fairness or disallows the criminalization of certain conduct. This is a standard that strikes the proper balance between the state's interest in finality and the criminal defendant's right to procedures that ensure fundamental fairness. By contrast, the rule of law espoused by the majority, the *Linkletter–Stovall* test, does not give adequate deference to considerations of finality. It gives little guidance by using such vague standards as (a) the purpose to be served by the new standards, (b) the extent of the

reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice. *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). In this respect, the *Linkletter–Stovall* test is amorphous, largely unstructured, and has been rightly criticized–by its very own architects–as leading to "unfortunate disparit[ies] in the treatment of similarly situated defendants on collateral review." *Teague,* 489 U.S. at 305, 109 S.Ct. 1060; *see also id.* at 302, 109 S.Ct. 1060 ("The *Linkletter* retroactivity standard has not led to consistent results."); *State ex rel. Taylor v. Whitley,* 606 So.2d 1292, 1297 (La.1992) (describing the *Linkletter–Stovall* test as unduly vague). "[T]he harm caused by the failure to treat similarly situated defendants alike cannot be exaggerated: such inequitable treatment 'hardly comports with the ideal of administration of justice with an even hand.'" *Teague,* 489 U.S. at 315, 109 S.Ct. 1060 (quoting *Hankerson v. North Carolina,* 432 U.S. 233, 247, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977) (Powell, J., concurring)).

In addition, the imprecise standards employed by the *Linkletter–Stovall* test may lead not only to disparate treatment, but also to uncertainty and unnecessary confusion in the application of new constitutional rules. As the Supreme Court of Arizona aptly observed:

> The law regarding retroactivity is complex enough, without requiring counsel and trial judges to apply different retroactivity rules, depending on whether the substantive decision is grounded on state law or federal constitutional principle—especially when many decisions are grounded on both.

*State v. Slemmer,* 170 Ariz. 174, 823 P.2d 41, 49 (1991).

I recognize that the federalist concerns that informed the *Teague* standard bear no relevance in state court proceedings, and principles of comity do not dictate application of *Teague* in state courts. However, I must agree that "[i]t would be a perversion [of these principles], not a service to them, to adopt rules of retroactivity ... that are broader than those adopted by federal courts, therefore according *less* respect to the finality of state court judgments than the federal courts themselves require." *Teague v. Palmateer,* 184 Or.App. 577, 57 P.3d 176, 183 (2002) (emphasis in original). Because state court application of the *Teague* analysis would serve important jurisprudential purposes, and especially advance society's considerable interest in finality, I would follow the overwhelming majority of our sister states in their well-reasoned adoption of the *Teague* standards. *See, e.g., State v. Zuniga,* 336 N.C. 508, 444 S.E.2d 443, 446 (1994); *Taylor,* 606 So.2d at 1297; *Pailin v. Vose,* 603 A.2d 738, 742 (R.I.1992); *Slemmer,* 823 P.2d at 49; *Morgan v. State,* 469 N.W.2d 419, 422 (Iowa 1991); *People v. Flowers,* 138 Ill.2d 218, 149 Ill.Dec. 304, 561 N.E.2d 674, 682 (1990); *Daniels v. State,* 561 N.E.2d 487, 489–90 (Ind.1990); *Commonwealth v. Bray,* 407 Mass. 296, 553 N.E.2d 538, 541 (1990).

Under these standards, Whitfield is not entitled to have *Ring* retroactively applied to his case. Determining whether a rule applies retroactively under *Teague* involves a multi-step analysis. First, the court must determine whether the petitioner's case is final, for if it is not, *Griffith v. Kentucky,* 479 U.S. 314, 322, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), mandates retroactive application. Next, the court must determine whether the petitioner asserts a "new" procedural rule, for if the rule is not new, or if it is substantive, it must be retroactively applied. *See Bousley v. United States,* 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). However, if

the rule is characterized as both procedural and new, it generally will not be applied retroactively in collateral proceedings. *Teague,* 489 U.S. at 310, 109 S.Ct. 1060.

Undisputedly, Whitfield's case is final, and even the majority concedes that *Ring* did not create a substantive right, but instead announced a rule of criminal procedure. Moreover, there is no dispute that *Ring* constituted a new rule. "[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* at 301, 109 S.Ct. 1060. Without question, precedent did not dictate *Ring's* holding at the time that Whitfield's conviction became final, as *Ring* expressly overruled *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), in which the Court had specifically validated judicial findings of death eligibility.

Because Whitfield's case is final, and *Ring* constituted a new rule of criminal procedure, the question of retroactivity turns on whether this new rule fits within one of "two narrow exceptions to the general rule of nonretroactivity." *Tyler v. Cain,* 533 U.S. 656, 665, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001). Under the *Teague* framework, new procedural rules do not apply retroactively unless: (1) the new rule "places certain kinds of primary, private individual conduct beyond the power of the law-making authority to proscribe," *Teague,* 489 U.S. at 307, 109 S.Ct. 1060, or (2) the rule announced is a "watershed rule" of criminal procedure that is "implicit in the concept of ordered liberty," *id.* at 311, 109 S.Ct. 1060.

The *Ring* rule clearly does not implicate the first exception: by requiring a jury determination of any fact that increases the maximum punishment, the Court did not purport to insulate certain conduct from the interdiction of the law. *See State v. Towery,* 204 Ariz. 386, 64 P.3d 828, 833

(2003); *Colwell v. Nevada,* 59 P.3d 463, 473 (Nev.2002); *see also United States v. Sanchez–Cervantes,* 282 F.3d 664, 668 (9th Cir. 2002) (stating that *Apprendi,* the basis of the *Ring* holding, does not fall within the first *Teague* exception).

Nor did *Ring* announce a watershed rule of criminal procedure. To qualify as a watershed rule, "the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding," and "[i]nfringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction." *Tyler,* 533 U.S. at 665, 121 S.Ct. 2478. A violation of the *Ring* rule obviously does not impair the accuracy of a conviction, as the failure to require a jury finding of facts necessary to increase the punishment in no way affects the reliability of the jury's determination of guilt. However, even if *Teague's* second exception encompasses rules that improve the accuracy of a sentence, as opposed to a conviction, I cannot conclude that allowing a judicial determination of facts subject to *Ring's* proscriptions would seriously diminish the likelihood of imposing accurate and fair sentences. As the Supreme Court of Arizona has recognized post-*Ring,* there is "no reason to believe that impartial juries will reach more accurate conclusions regarding the presence of aggravating circumstances than did an impartial judge." *Towery,* 64 P.3d at 834.

But regardless of whether judicial determinations are indeed equally reliable, a rule must "also alter our understanding of the bedrock procedural elements essential to a fair trial" to come within the purview of *Teague's* second exception. *Tyler,* 533 U.S. at 665, 121 S.Ct. 2478. In other words, the rule "must implicate the fundamental fairness of the trial." *Teague,* 489 U.S. at 312, 109 S.Ct. 1060. Questions of

fundamental fairness are not implicated by the rule announced in *Ring,* however, because the Supreme Court itself has acknowledged that the right to a jury trial, even as extended under *Ring,* "does not turn on the relative rationality, fairness, or efficiency of potential factfinders." *Ring,* 536 U.S. at 607, 122 S.Ct. 2428.

This is the import of the Supreme Court's holding in *DeStefano v. Woods,* 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968), *Daniel v. Louisiana,* 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975), and this Court's holding in *State ex rel. Nixon v. Sprick,* 59 S.W.3d 515 (Mo. banc 2001). In *DeStefano,* the Court concluded that the basic Sixth Amendment right to a jury trial–as applied in criminal contempt actions–did not apply retroactively, and in doing so it refused to presuppose that "a defendant may never be as fairly treated by a judge as he would be by a jury." *Id.* at 633, 88 S.Ct. 2093 (quoting *Duncan v. Louisiana,* 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)). In *Daniel,* the Court held that the fair cross-section requirement of the Sixth Amendment was not to be given retroactive effect, as this requirement does not "rest on the premise that every criminal trial, or any particular trial, [is] necessarily unfair because it [is] not conducted in accordance with what we determined to be the requirements of the Sixth Amendment." 420 U.S. at 32, 95 S.Ct. 704. Logically, if the Supreme Court has held that the Sixth Amendment right to a jury trial is not so fundamental as to require retroactive application, it follows that the ancillary right to a jury determination of facts that increases punishment is not a rule of such watershed magnitude as to warrant retroactive application under *Teague's* second exception. Finally, this Court, citing *Dukes v. United States,* 255 F.3d 912, 913 (8th Cir.2001), an Eighth Circuit case utilizing the *Teague* analysis, has explicitly rejected the argument that

the holding of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), must be retroactively applied to cases on collateral review. *Sprick,* 59 S.W.3d at 520. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348. If this holding is not to be retroactively applied in Missouri court collateral proceedings, it would seem as though *Ring*—which is nothing more than the logical extension of *Apprendi*—cannot justifiably be retroactively applied to cases on collateral review.

## V.

In conclusion, I disagree with the majority's disregard for established post-conviction procedures, I disagree with the majority's application of *Ring v. Arizona* to Missouri's capital sentencing statute, and I disagree with the majority's rejection of *Teague v. Lane's* reasoned retroactivity analysis. I would hold that there was no error, and refuse to recall the Court's mandate. All that said, given the majority's determination that error was committed, I concur in the separate opinion of Judge Price to the extent that it would hold that the proper remedy is a new penalty phase trial rather than commutation to a life sentence.